ILLINOIS ᴇx ʀᴇʟ. McCOLLUM *v.* BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 71, CHAMPAIGN COUNTY, ILLINOIS, ᴇᴛ ᴀʟ.

No. 90.  Argued December 8, 1947.—Decided March 8, 1948.

*Walter F. Dodd* and *Edward R. Burke* argued the cause for appellant. *Mr. Dodd* also filed a brief.

*John L. Franklin* and *Owen Rall* argued the cause and filed a brief for appellees.

Briefs of *amici curiae* urging reversal were filed by *Henry Epstein, Leo Pfeffer* and *Samuel Rothstein* for the Synagogue Council of America et al.; *Herbert A. Wolff* for the American Ethical Union; *E. Hilton Jackson, Challen B. Ellis, W. D. Jamieson* and *Kahl K. Spriggs* for the Joint Conference Committee on Public Relations of several Baptist conventions; *Edward C. Park* for the American Unitarian Association; *Kenneth W. Greenawalt, Leon Despres, Russell Whitman, John D. Miller, William L. Marbury, Thomas H. Eliot, Winthrop Wadleigh, Whitney N. Seymour* and *Gurney Edwards* for the American Civil Liberties Union; and *Homer Cummings* and *William D. Donnelly* for the General Conference of Seventh Day Adventists.

*George F. Barrett,* Attorney General of Illinois, and *William C. Wines,* Assistant Attorney General, filed a brief as *amici curiae,* urging affirmance.

*Charles H. Tuttle* filed a brief for the Protestant Council of New York City, as *amicus curiae.*

Mr. Justice Black delivered the opinion of the Court.

This case relates to the power of a state to utilize its tax-supported public school system in aid of religious

instruction insofar as that power may be restricted by the First and Fourteenth Amendments to the Federal Constitution.

The appellant, Vashti McCollum, began this action for mandamus against the Champaign Board of Education in the Circuit Court of Champaign County, Illinois. Her asserted interest was that of a resident and taxpayer of Champaign and of a parent whose child was then enrolled in the Champaign public schools. Illinois has a compulsory education law which, with exceptions, requires parents to send their children, aged seven to sixteen, to its tax-supported public schools where the children are to remain in attendance during the hours when the schools are regularly in session. Parents who violate this law commit a misdemeanor punishable by fine unless the children attend private or parochial schools which meet educational standards fixed by the State. District boards of education are given general supervisory powers over the use of the public school buildings within the school districts. Ill. Rev. Stat. ch. 122, §§ 123, 301 (1943).

Appellant's petition for mandamus alleged that religious teachers, employed by private religious groups, were permitted to come weekly into the school buildings during the regular hours set apart for secular teaching, and then and there for a period of thirty minutes substitute their religious teaching for the secular education provided under the compulsory education law. The petitioner charged that this joint public-school religious-group program violated the First and Fourteenth Amendments to the United States Constitution. The prayer of her petition was that the Board of Education be ordered to "adopt and enforce rules and regulations prohibiting all instruction in and teaching of religious education in all public schools in Champaign School District Number 71, . . . and in all public school houses and buildings in said district when occupied by public schools."

The board first moved to dismiss the petition on the ground that under Illinois law appellant had no standing to maintain the action. This motion was denied. An answer was then filed, which admitted that regular weekly religious instruction was given during school hours to those pupils whose parents consented and that those pupils were released temporarily from their regular secular classes for the limited purpose of attending the religious classes. The answer denied that this coordinated program of religious instruction violated the State or Federal Constitution. Much evidence was heard, findings of fact were made, after which the petition for mandamus was denied on the ground that the school's religious instruction program violated neither the federal nor state constitutional provisions invoked by the appellant. On appeal the State Supreme Court affirmed. 396 Ill. 14, 71 N. E. 2d 161. Appellant appealed to this Court under 28 U. S. C. § 344 (a), and we noted probable jurisdiction on June 2, 1947.

The appellees press a motion to dismiss the appeal on several grounds, the first of which is that the judgment of the State Supreme Court does not draw in question the "validity of a statute of any State" as required by 28 U. S. C. § 344 (a). This contention rests on the admitted fact that the challenged program of religious instruction was not expressly authorized by statute. But the State Supreme Court has sustained the validity of the program on the ground that the Illinois statutes granted the board authority to establish such a program. This holding is sufficient to show that the validity of an Illinois statute was drawn in question within the meaning of 28 U. S. C. § 344 (a). *Hamilton* v. *Regents of U. of Cal.,* 293 U. S. 245, 258. A second ground for the motion to dismiss is that the appellant lacks standing to maintain the action, a ground which is also without merit. *Coleman* v. *Miller,* 307 U. S. 433, 443, 445, 464.

A third ground for the motion is that the appellant failed properly to present in the State Supreme Court her challenge that the state program violated the Federal Constitution. But in view of the express rulings of both state courts on this question, the argument cannot be successfully maintained. The motion to dismiss the appeal is denied.

Although there are disputes between the parties as to various inferences that may or may not properly be drawn from the evidence concerning the religious program, the following facts are shown by the record without dispute.[1] In 1940 interested members of the Jewish, Roman Catholic, and a few of the Protestant faiths formed a voluntary association called the Champaign Council on Religious Education. They obtained permission from the Board of Education to offer classes in religious instruction to public school pupils in grades four to nine inclusive. Classes were made up of pupils whose parents signed printed cards requesting that their children be permitted to attend;[2] they were held weekly, thirty minutes for

---

[1] Appellant, taking issue with the facts found by the Illinois courts, argues that the religious education program in question is invalid under the Federal Constitution for any one of the following reasons: (1) In actual practice certain Protestant groups have obtained an overshadowing advantage in the propagation of their faiths over other Protestant sects; (2) the religious education program was voluntary in name only because in fact subtle pressures were brought to bear on the students to force them to participate in it; and (3) the power given the school superintendent to reject teachers selected by religious groups and the power given the local Council on Religious Education to determine which religious faiths should participate in the program was a prior censorship of religion.

In view of our decision we find it unnecessary to consider these arguments or the disputed facts upon which they depend.

[2] The Supreme Court described the request card system as follows: ". . . Admission to the classes was to be allowed only upon the express written request of parents, and then only to classes designated by the parents. . . . Cards were distributed to the parents

the lower grades, forty-five minutes for the higher. The council employed the religious teachers at no expense to the school authorities, but the instructors were subject to the approval and supervision of the superintendent of schools.[3]  The classes were taught in three

of elementary students by the public-school teachers requesting them to indicate whether they desired their children to receive religious education.  After being filled out, the cards were returned to the teachers of religious education classes either by the public-school teachers or the children. . . ."  On this subject the trial court found that ". . . those students who have obtained the written consent of their parents therefor are released by the school authorities from their secular work, and in the grade schools for a period of thirty minutes' instruction in each week during said school hours, and forty-five minutes during each week in the junior high school, receive training in religious education. . . .  Certain cards are used for obtaining permission of parents for their children to take said religious instruction courses, and they are made available through the offices of the superintendent of schools and through the hands of principals and teachers to the pupils of the school district.  Said cards are prepared at the cost of the council of religious education.  The handling and distribution of said cards does not interfere with the duties or suspend the regular secular work of the employees of the defendant. . . ."

[3] The State Supreme Court said: "The record further discloses that the teachers conducting the religious classes were not teachers in the public schools but were subject to the approval and supervision of the superintendent. . . ."  The trial court found: "Before any faith or other group may obtain permission from the defendant for the similar, free and equal use of rooms in the public school buildings said faith or group must make application to the superintendent of schools of said School District Number 71, who in turn will determine whether or not it is practical for said group to teach in said school system."  The president of the local school board testified: ". . . The Protestants would have one group and the Catholics, and would be given a room where they would have the class and we would go along with the plan of the religious people.  They were all to be treated alike, with the understanding that the teachers they would bring into the school were approved by the superintendent. . . .  The superintendent was the last word so far as the individual was concerned. . . ."

separate religious groups by Protestant teachers,[4] Catholic priests, and a Jewish rabbi, although for the past several years there have apparently been no classes instructed in the Jewish religion. Classes were conducted in the regular classrooms of the school building. Students who did not choose to take the religious instruction were not released from public school duties; they were required to leave their classrooms and go to some other place in the school building for pursuit of their secular studies. On the other hand, students who were released from secular study for the religious instructions were required to be present at the religious classes. Reports of their presence or absence were to be made to their secular teachers.[5]

The foregoing facts, without reference to others that appear in the record, show the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education. The operation of the State's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released

---

[4] There were two teachers of the Protestant faith. One was a Presbyterian and had been a foreign missionary for that church. The second testified as follows: "I am affiliated with the Christian church. I also work in the Methodist Church and I taught at the Presbyterian. I am married to a Lutheran."

[5] The director of the Champaign Council on Religious Education testified: ". . . If any pupil is absent we turn in a slip just like any teacher would to the superintendent's office. The slip is a piece of paper with a number of hours in the school day and a square, and the teacher of the particular room for the particular hour records the absentees. It has their names and the grade and the section to which they belong. It is the same sheet that the geography and history teachers and all the other teachers use, and is furnished by the school. . . ."

in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth) as we interpreted it in *Everson* v. *Board of Education,* 330 U. S. 1. There we said: "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.[6] Neither can force or influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.[7] Neither a state nor

---

[6] The dissent, agreed to by four judges, said: "The problem then cannot be cast in terms of legal discrimination or its absence. This would be true, even though the state in giving aid should treat all religious instruction alike. . . . Again, it was the furnishing of 'contributions of money for the propagation of opinions which he disbelieves' that the fathers outlawed. That consequence and effect are not removed by multiplying to all-inclusiveness the sects for which support is exacted. The Constitution requires, not comprehensive identification of state with religion, but complete separation." *Everson* v. *Board of Education,* 330 U. S. 1, 59, 60.

[7] The dissenting judges said: "In view of this history no further proof is needed that the Amendment forbids any appropriation, large or small, from public funds to aid or support any and all religious exercises. . . . Legislatures are free to make, and courts to sustain, appropriations only when it can be found that in fact they do not aid, promote, encourage or sustain religious teaching or observances, be the amount large or small." *Everson* v. *Board of Education,* 330 U. S. 1, 41, 52–53.

the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*.  In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' " *Id.* at 15–16.  The majority in the *Everson* case, and the minority as shown by quotations from the dissenting views in our notes 6 and 7, agreed that the First Amendment's language, properly interpreted, had erected a wall of separation between Church and State.  They disagreed as to the facts shown by the record and as to the proper application of the First Amendment's language to those facts.

Recognizing that the Illinois program is barred by the First and Fourteenth Amendments if we adhere to the views expressed both by the majority and the minority in the *Everson* case, counsel for the respondents challenge those views as dicta and urge that we reconsider and repudiate them.  They argue that historically the First Amendment was intended to forbid only government preference of one religion over another, not an impartial governmental assistance of all religions.  In addition they ask that we distinguish or overrule our holding in the *Everson* case that the Fourteenth Amendment made the "establishment of religion" clause of the First Amendment applicable as a prohibition against the States. After giving full consideration to the arguments presented we are unable to accept either of these contentions.

To hold that a state cannot consistently with the First and Fourteenth Amendments utilize its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals does not, as counsel urge, manifest a governmental hostility to religion or religious teachings.  A manifestation of such hostility would be at war with our national tradition as embodied in the First Amendment's guaranty of the free

exercise of religion. For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere. Or, as we said in the *Everson* case, the First Amendment has erected a wall between Church and State which must be kept high and impregnable.

Here not only are the State's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State.

The cause is reversed and remanded to the State Supreme Court for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER delivered the following opinion, in which MR. JUSTICE JACKSON, MR. JUSTICE RUTLEDGE and MR. JUSTICE BURTON join.*

We dissented in *Everson* v. *Board of Education,* 330 U. S. 1, because in our view the Constitutional principle requiring separation of Church and State compelled invalidation of the ordinance sustained by the majority. Illinois has here authorized the commingling of sectarian with secular instruction in the public schools. The Constitution of the United States forbids this.

This case, in the light of the *Everson* decision, demonstrates anew that the mere formulation of a relevant Constitutional principle is the beginning of the solution of a problem, not its answer. This is so because the mean-

---

*MR. JUSTICE RUTLEDGE and MR. JUSTICE BURTON concurred also in the Court's opinion.

ing of a spacious conception like that of the separation of Church from State is unfolded as appeal is made to the principle from case to case. We are all agreed that the First and the Fourteenth Amendments have a secular reach far more penetrating in the conduct of Government than merely to forbid an "established church." But agreement, in the abstract, that the First Amendment was designed to erect a "wall of separation between church and State," does not preclude a clash of views as to what the wall separates. Involved is not only the Constitutional principle but the implications of judicial review in its enforcement. Accommodation of legislative freedom and Constitutional limitations upon that freedom cannot be achieved by a mere phrase. We cannot illuminatingly apply the "wall-of-separation" metaphor until we have considered the relevant history of religious education in America, the place of the "released time" movement in that history, and its precise manifestation in the case before us.

To understand the particular program now before us as a conscientious attempt to accommodate the allowable functions of Government and the special concerns of the Church within the framework of our Constitution and with due regard to the kind of society for which it was designed, we must put this Champaign program of 1940 in its historic setting. Traditionally, organized education in the Western world was Church education. It could hardly be otherwise when the education of children was primarily study of the Word and the ways of God. Even in the Protestant countries, where there was a less close identification of Church and State, the basis of education was largely the Bible, and its chief purpose inculcation of piety. To the extent that the State intervened, it used its authority to further aims of the Church.

The emigrants who came to these shores brought this view of education with them. Colonial schools certainly

started with a religious orientation. When the common problems of the early settlers of the Massachusetts Bay Colony revealed the need for common schools, the object was the defeat of "one chief project of that old deluder, Satan, to keep men from the knowledge of the Scriptures." The Laws and Liberties of Massachusetts, 1648 edition (Cambridge 1929) 47.[1]

The evolution of colonial education, largely in the service of religion, into the public school system of today is the story of changing conceptions regarding the American democratic society, of the functions of State-maintained education in such a society, and of the role therein of the free exercise of religion by the people. The modern public school derived from a philosophy of freedom reflected in the First Amendment. It is appropriate to recall that the Remonstrance of James Madison, an event basic in the history of religious liberty, was called forth by a proposal which involved support to religious education. See Mr. Justice Rutledge's opinion in the *Everson* case, *supra,* 330 U. S. at 36–37. As the momentum for popular education increased and in turn evoked strong claims for State support of religious education, contests not unlike that which in Virginia had produced Madison's Remonstrance appeared in various forms in other States. New York and Massachusetts provide famous chapters in the history that established dissociation of religious teaching from State-maintained schools. In New York, the rise of the common schools led, despite fierce sectarian opposition, to the barring of tax funds to church schools, and later to any school in which sectarian doctrine was

---

[1] For an exposition of the religious origins of American education, see S. W. Brown, The Secularization of American Education (1912) cc. I, II; Knight, Education in the United States (2d rev. ed. 1941) cc. III, V; Cubberley, Public Education in the United States (1934) cc. II, III.

taught.[2] In Massachusetts, largely through the efforts of Horace Mann, all sectarian teachings were barred from the common school to save it from being rent by denominational conflict.[3] The upshot of these controversies, often long and fierce, is fairly summarized by saying that long before the Fourteenth Amendment subjected the States to new limitations, the prohibition of furtherance by the State of religious instruction became the guiding principle, in law and feeling, of the American people. In sustaining Stephen Girard's will, this Court referred to the inevitable conflicts engendered by matters "connected with religious polity" and particularly "in a country composed of such a variety of religious sects as our country." *Vidal* v. *Girard's Executors*, 2 How. 127, 198. That was more than one hundred years ago.

Separation in the field of education, then, was not imposed upon unwilling States by force of superior law. In this respect the Fourteenth Amendment merely reflected a principle then dominant in our national life. To the extent that the Constitution thus made it binding upon the States, the basis of the restriction is the whole experience of our people. Zealous watchfulness against fusion of secular and religious activities by Government itself, through any of its instruments but especially through its educational agencies, was the democratic response of the American community to the particular needs of a young and growing nation, unique in the composition of its

---

[2] See Boese, Public Education in the City of New York (1869) c. XIV; Hall, Religious Education in the Public Schools of the State and City of New York (1914) cc. VI, VII; Palmer, The New York Public School (1905) cc. VI, VII, X, XII. And see New York Laws 1842, c. 150, § 14, amended, New York Laws 1844, c. 320, § 12.

[3] S. M. Smith, The Relation of the State to Religious Education in Massachusetts (1926) c. VII; Culver, Horace Mann and Religion in the Massachusetts Public Schools (1929).

people.[4]   A totally different situation elsewhere, as illustrated for instance by the English provisions for religious education in State-maintained schools, only serves to illustrate that free societies are not cast in one mould.   See the Education Act of 1944, 7 and 8 Geo. VI, c. 31. Different institutions evolve from different historic circumstances.

It is pertinent to remind that the establishment of this principle of Separation in the field of education was not due to any decline in the religious beliefs of the people. Horace Mann was a devout Christian, and the deep religious feeling of James Madison is stamped upon the Remonstrance.   The secular public school did not imply indifference to the basic role of religion in the life of the people, nor rejection of religious education as a means of fostering it.   The claims of religion were not minimized by refusing to make the public schools agencies for their assertion.   The non-sectarian or secular public school was the means of reconciling freedom in general with religious freedom.   The sharp confinement of the public schools to secular education was a recognition of the need of a democratic society to educate its children, insofar as the State undertook to do so, in an atmosphere free from pressures in a realm in which pressures are most resisted and where conflicts are most easily and most bitterly engendered.   Designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people, the public school must keep scrupu-

---

[4] It has been suggested that secular education in this country is the inevitable "product of 'the utter impossibility of harmonizing multiform creeds.'"   T. W. M. Marshall, *Secular Education in England and the United States,* 1 American Catholic Quarterly Review 278, 308.   It is precisely because of this "utter impossibility" that the fathers put into the Constitution the principle of complete "hands-off," for a people as religiously heterogeneous as ours.

lously free from entanglement in the strife of sects. The preservation of the community from divisive conflicts, of Government from irreconcilable pressures by religious groups, of religion from censorship and coercion however subtly exercised, requires strict confinement of the State to instruction other than religious, leaving to the individual's church and home, indoctrination in the faith of his choice.

This development of the public school as a symbol of our secular unity was not a sudden achievement nor attained without violent conflict.[5] While in small communities of comparatively homogeneous religious beliefs, the need for absolute separation presented no urgencies, elsewhere the growth of the secular school encountered the resistance of feeling strongly engaged against it. But the inevitability of such attempts is the very reason for Constitutional provisions primarily concerned with the protection of minority groups. And such sects are shifting groups, varying from time to time, and place to place, thus representing in their totality the common interest of the nation.

Enough has been said to indicate that we are dealing not with a full-blown principle, nor one having the definiteness of a surveyor's metes and bounds. But by 1875 the separation of public education from Church entanglements, of the State from the teaching of religion, was firmly established in the consciousness of the nation. In

---

[5] See Cubberley, Public Education in the United States (1934) pp. 230 et seq.; Zollmann, *The Relation of Church and State,* in Lotz and Crawford, Studies in Religious Education (1931) 403, 418 et seq.; Payson Smith, *The Public Schools and Religious Education,* in Religion and Education (Sperry, Editor, 1945) pp. 32 et seq.; also Mahoney, The Relation of the State to Religious Education in Early New York 1633–1825 (1941) c. VI; McLaughlin, A History of State Legislation Affecting Private Elementary and Secondary Schools in the United States, 1870–1945 (1946) c. I; and see note 10, *infra.*

that year President Grant made his famous remarks to the Convention of the Army of the Tennessee:

> "Encourage free schools, and resolve that not one dollar appropriated for their support shall be appropriated to the support of any sectarian schools. Resolve that neither the State nor nation, nor both combined, shall support institutions of learning other than those sufficient to afford every child growing up in the land the opportunity of a good common-school education, unmixed with sectarian, pagan, or atheistical dogmas. Leave the matter of religion to the family altar, the church, and the private school, supported entirely by private contributions. Keep the church and the state forever separate." "The President's Speech at Des Moines," 22 *Catholic World* 433, 434–35 (1876).

So strong was this conviction, that rather than rest on the comprehensive prohibitions of the First and Fourteenth Amendments, President Grant urged that there be written into the United States Constitution particular elaborations, including a specific prohibition against the use of public funds for sectarian education,[6] such as had

---

[6] President Grant's Annual Message to Congress, December 7, 1875, 4 Cong. Rec. 175 *et seq.*; Ames, The Proposed Amendments to the Constitution of the United States during the First Century of its History, H. R. Doc. No. 353, Pt. 2, 54th Cong., 2d Sess., pp. 277–78. In addition to the first proposal, "The Blaine Amendment," five others to similar effect are cited by Ames. The reason for the failure of these attempts seems to have been in part that the "provisions of the State constitutions are in almost all instances adequate on this subject, and no amendment is likely to be secured." *Id.*

In the form in which it passed the House of Representatives, the Blaine Amendment read as follows: "No State shall make any law respecting an establishment of religion, or prohibiting the free exercise thereof; and no religious test shall ever be required as a qualification to any office or public trust under any State. No public

been written into many State constitutions.[7]   By 1894, in urging the adoption of such a provision in the New York Constitution, Elihu Root was able to summarize a century of the nation's history: "It is not a question of religion, or of creed, or of party; it is a question of declaring and maintaining the great American principle of eternal separation between Church and State."   Root, Addresses on Government and Citizenship, 137, 140.[8]   The extent to which

property, and no public revenue of, nor any loan of credit by or under the authority of, the United States, or any State, Territory, District, or municipal corporation, shall be appropriated to, or made or used for, the support of any school, educational or other institution, under the control of any religious or anti-religious sect, organization, or denomination, or wherein the particular creed or tenets of any religious or anti-religious sect, organization, or denomination shall be taught.   And no such particular creed or tenets shall be read or taught in any school or institution supported in whole or in part by such revenue or loan of credit; and no such appropriation or loan of credit shall be made to any religious or anti-religious sect, organization, or denomination, or to promote its interests or tenets.   This article shall not be construed to prohibit the reading of the Bible in any school or institution; and it shall not have the effect to impair rights of property already vested. . . ." H. Res. 1, 44th Cong., 1st Sess. (1876).

[7] See *Constitutions of the States and United States,* III Report of the New York State Constitutional Convention Committee (1938) Index, pp. 1766–67.

[8] It is worthy of interest that another famous American lawyer, and indeed one of the most distinguished of American judges, Jeremiah S. Black, expressed similar views nearly forty years before Mr. Root: "The manifest object of the men who framed the institutions of this country, was to have a *State without religion,* and a *Church without politics*—that is to say, they meant that one should never be used as an engine for any purpose of the other . . . .   Our fathers seem to have been perfectly sincere in their belief that the members of the Church would be more patriotic, and the citizens of the State more religious, by keeping their respective functions entirely separate.   For that reason they built up a wall of complete and perfect partition between the two."   From *Religious Liberty*

this principle was deemed a presupposition of our Constitutional system is strikingly illustrated by the fact that every State admitted into the Union since 1876 was compelled by Congress to write into its constitution a requirement that it maintain a school system "free from sectarian control." [9]

Prohibition of the commingling of sectarian and secular instruction in the public school is of course only half the story. A religious people was naturally concerned about the part of the child's education entrusted "to the family altar, the church, and the private school." The promotion of religious education took many forms. Laboring under financial difficulties and exercising only persuasive authority, various denominations felt handicapped in their task of religious education. Abortive

---

(1856) in Black, Essays and Speeches (1886) 51, 53; cf. Brigance, Jeremiah Sullivan Black (1934). While Jeremiah S. Black and Elihu Root had many things in common, there were also important differences between them, perhaps best illustrated by the fact that one became Secretary of State to President Buchanan, the other to Theodore Roosevelt. That two men, with such different political alignment, should have shared identic views on a matter so basic to the well-being of our American democracy affords striking proof of the respect to be accorded to that principle.

[9] 25 Stat. 676, 677, applicable to North Dakota, South Dakota, Montana and Washington, required that the constitutional conventions of those States "provide, by ordinances irrevocable without the consent of the United States and the people of said States . . . for the establishment and maintenance of systems of public schools, which shall be open to all the children of said States, and free from sectarian control . . . ." The same provision was contained in the Enabling Act for Utah, 28 Stat. 107, 108; Oklahoma, 34 Stat. 267, 270; New Mexico and Arizona, 36 Stat. 557, 559, 570. Idaho and Wyoming were admitted after adoption of their constitutions; that of Wyoming contained an irrevocable ordinance in the same terms. Wyoming Constitution, 1889, Ordinances, § 5. The Constitution of Idaho, while it contained no irrevocable ordinance, had a provision even more explicit in its establishment of separation. Idaho Constitution, 1889, art. IX, § 5.

attempts were therefore frequently made to obtain public funds for religious schools.[10] But the major efforts of religious inculcation were a recognition of the principle of Separation by the establishment of church schools privately supported. Parochial schools were maintained by various denominations. These, however, were often beset by serious handicaps, financial and otherwise, so that the religious aims which they represented found other directions. There were experiments with vacation schools, with Saturday as well as Sunday schools.[11] They all fell short of their purpose. It was urged that by appearing to make religion a one-day-a-week matter, the

[10] See, e. g., the New York experience, including, inter alia, the famous Hughes controversy of 1840–42, the conflict culminating in the Constitutional Convention of 1894, and the attempts to restore aid to parochial schools by revision of the New York City Charter, in 1901, and at the State Constitutional Convention of 1938. See McLaughlin, A History of State Legislation Affecting Private Elementary and Secondary Schools in the United States, 1870–1945 (1946) pp. 119–25; Mahoney, The Relation of the State to Religious Education in Early New York 1633–1825 (1941) c. VI; Hall, Religious Education in the Public Schools of the State and the City of New York (1914) pp. 46–47; Boese, Public Education in the City of New York (1869) c. XIV; Compare New York Laws 1901, vol. 3, § 1152, p. 492, with amendment, id., p. 668; see Nicholas Murray Butler, Religion and Education (Editorial) in 22 Educational Review 101, June, 1901; New York Times, April 8, 1901, p. 1, col. 1; April 9, 1901, p. 2, col. 5; April 19, 1901, p. 2, col. 2; April 21, 1901, p. 1, col. 3; Editorial, April 22, 1901, p. 6, col. 1.

Compare S. 2499, 79th Cong., 2d Sess., providing for Federal aid to education, and the controversy engendered over the inclusion in the aid program of sectarian schools, fully discussed in, e. g., "The Nation's Schools," January through June, 1947.

[11] For surveys of the development of private religious education, see, e. g., A. A. Brown, A History of Religious Education in Recent Times (1923); Athearn, Religious Education and American Democracy (1917); Burns and Kohlbrenner, A History of Catholic Education in the United States (1937); Lotz and Crawford, Studies in Religious Education (1931) Parts I and IV.

Sunday school, which acquired national acceptance, tended to relegate the child's religious education, and thereby his religion, to a minor role not unlike the enforced piano lesson.

Out of these inadequate efforts evolved the week-day church school, held on one or more afternoons a week after the close of the public school. But children continued to be children; they wanted to play when school was out, particularly when other children were free to do so. Church leaders decided that if the week-day church school was to succeed, a way had to be found to give the child his religious education during what the child conceived to be his "business hours."

The initiation of the movement[12] may fairly be attributed to Dr. George U. Wenner. The underlying assumption of his proposal, made at the Interfaith Conference on Federation held in New York City in 1905, was that the public school unduly monopolized the child's time and that the churches were entitled to their share of it.[13] This, the schools should "release." Accordingly, the Federation, citing the example of the Third Republic of France,[14] urged that upon the request of their parents

[12] Reference should be made to Jacob Gould Schurman, who in 1903 proposed a plan bearing close resemblance to that of Champaign. See Symposium, 75 The Outlook 635, 636, November 14, 1903; Crooker, Religious Freedom in American Education (1903) pp. 39 et seq.

[13] For the text of the resolution, a brief in its support, as well as an exposition of some of the opposition it inspired, see Wenner's book, Religious Education and the Public School (rev. ed. 1913).

[14] The French example is cited not only by Wenner but also by Nicholas Murray Butler, who thought released time was "restoring the American system in the state of New York." The Place of Religious Instruction in Our Educational System, 7 Vital Speeches 167, 168 (Nov. 28, 1940); see also Report of the President of Columbia University, 1934, pp. 22–24. It is important to note, however, that the French practice must be viewed as the result of the struggle to

children be excused from public school on Wednesday afternoon, so that the churches could provide "Sunday school on Wednesday." This was to be carried out on church premises under church authority. Those not desiring to attend church schools would continue their normal classes. Lest these public school classes unfairly compete with the church education, it was requested that the school authorities refrain from scheduling courses or activities of compelling interest or importance.

The proposal aroused considerable opposition and it took another decade for a "released time" scheme to become part of a public school system. Gary, Indiana, inaugurated the movement. At a time when industrial

---

emancipate the French schools from control by the Church. The leaders of this revolution, men like Paul Bert, Ferdinand Buisson, and Jules Ferry, agreed to this measure as one part of a great step towards, rather than a retreat from, the principle of Separation. The history of these events is described in Muzzey, *State, Church, and School in France,* The School Review, March through June, 1911.

In effect, moreover, the French practice differs in crucial respects from both the Wenner proposal and the Champaign system. The law of 1882 provided that "Public elementary schools will be closed one day a week in addition to Sunday in order to permit parents, if they so desire, to have their children given religious instruction outside of school buildings." Law No. 11,696, March 28, 1882, Bulletin des Lois, No. 690. This then approximates that aspect of released time generally known as "dismissed time." No children went to school on that day, and the public school was therefore not an alternative used to impel the children towards the religious school. The religious education was given "outside of school buildings."

The Vichy Government attempted to introduce a program of religious instruction within the public school system remarkably similar to that in effect in Champaign. The proposal was defeated by intense opposition which included the protest of the French clergy, who apparently feared State control of the Church. See Schwartz, *Religious Instruction under Pétain,* 58 Christian Century 1170, Sept. 24, 1941.

expansion strained the communal facilities of the city, Superintendent of Schools Wirt suggested a fuller use of the school buildings. Building on theories which had become more or less current, he also urged that education was more than instruction in a classroom. The school was only one of several educational agencies. The library, the playground, the home, the church, all have their function in the child's proper unfolding. Accordingly, Wirt's plan sought to rotate the schedules of the children during the school-day so that some were in class, others were in the library, still others in the playground. And some, he suggested to the leading ministers of the City, might be released to attend religious classes if the churches of the City cooperated and provided them. They did, in 1914, and thus was "released time" begun. The religious teaching was held on church premises and the public schools had no hand in the conduct of these church schools. They did not supervise the choice of instructors or the subject matter taught. Nor did they assume responsibility for the attendance, conduct or achievement of the child in a church school; and he received no credit for it. The period of attendance in the religious schools would otherwise have been a play period for the child, with the result that the arrangement did not cut into public school instruction or truly affect the activities or feelings of the children who did not attend the church schools.[15]

From such a beginning "released time" has attained substantial proportions. In 1914-15, under the Gary program, 619 pupils left the public schools for the church schools during one period a week. According to responsible figures almost 2,000,000 in some 2,200 communities

---

[15] Of the many expositions of the Gary plan, see, *e. g.*, A. A. Brown, *The Week-Day Church Schools of Gary, Indiana,* 11 Religious Education 5 (1916); Wirt, *The Gary Public Schools and the Churches, id.* at 221 (1916).

participated in "released time" programs during 1947.[16] A movement of such scope indicates the importance of the problem to which the "released time" programs are directed. But to the extent that aspects of these programs are open to Constitutional objection, the more extensively the movement operates, the more ominous the breaches in the wall of separation.

Of course, "released time" as a generalized conception, undefined by differentiating particularities, is not an issue for Constitutional adjudication. Local programs differ from each other in many and crucial respects. Some "released time" classes are under separate denominational auspices, others are conducted jointly by several denominations, often embracing all the religious affiliations of a community. Some classes in religion teach a limited sectarianism; others emphasize democracy, unity and spiritual values not anchored in a particular creed. Insofar as these are manifestations merely of the free exercise of religion, they are quite outside the scope of judicial concern, except insofar as the Court may be called upon to protect the right of religious freedom. It is only when challenge is made to the share that the public schools have in the execution of a particular "released time" program that close judicial scrutiny is demanded of the exact relation between the religious instruction and the public educational system in the specific situation before the Court.[17]

---

[16] See the 1947 Yearbook, International Council of Religious Education, p. 76; also New York Times, September 21, 1947, p. 22, col. 1.

[17] Respects in which programs differ include, for example, the amount of supervision by the public school of attendance and performance in the religious class, of the course of study, of the selection of teachers; methods of enrolment and dismissal from the secular classes; the amount of school time devoted to operation of the program; the extent to which school property and administrative machinery are

The substantial differences among arrangements lumped together as "released time" emphasize the importance of detailed analysis of the facts to which the Constitutional test of Separation is to be applied. How does "released time" operate in Champaign? Public school teachers distribute to their pupils cards supplied by church groups, so that the parents may indicate whether they desire religious instruction for their children. For those desiring it, religious classes are conducted in the regular classrooms of the public schools by teachers of religion paid by the churches and appointed by them, but, as the State court found, "subject to the approval and supervision of the superintendent." The courses do not profess to give secular instruction in subjects concerning religion. Their candid purpose is sectarian teaching. While a child can go to any of the religious classes offered, a particular sect wishing a teacher for its devotees requires the permission of the school superintendent "who in turn will determine whether or not it is practical for said group to teach in said school

---

involved; the effect on the public school program of the introduction of "released time"; the proportion of students who seek to be excused; the effect of the program on non-participants; the amount and nature of the publicity for the program in the public schools.

The studies of detail in "released time" programs are voluminous. Most of these may be found in the issues of such periodicals as The International Journal of Religious Education, Religious Education, and Christian Century. For some of the more comprehensive studies found elsewhere, see Davis, Weekday Classes in Religious Education, U. S. Office of Education Bulletin 1941, No. 3; Gorham, A Study of the Status of Weekday Church Schools in the United States (1934); Lotz, *The Weekday Church School*, in Lotz and Crawford, Studies in Religious Education (1931) c. XII; Forsyth, Week-Day Church Schools (1930); Settle, The Weekday Church School, Educational Bulletin No. 601 of The International Council of Religious Education (1930); Shaver, Present-Day Trends in Religious Education (1928) cc. VII, VIII; Gove, Religious Education on Public School Time (1926).

system." If no provision is made for religious instruction in the particular faith of a child, or if for other reasons the child is not enrolled in any of the offered classes, he is required to attend a regular school class, or a study period during which he is often left to his own devices. Reports of attendance in the religious classes are submitted by the religious instructor to the school authorities, and the child who fails to attend is presumably deemed a truant.

Religious education so conducted on school time and property is patently woven into the working scheme of the school. The Champaign arrangement thus presents powerful elements of inherent pressure by the school system in the interest of religious sects. The fact that this power has not been used to discriminate is beside the point. Separation is a requirement to abstain from fusing functions of Government and of religious sects, not merely to treat them all equally. That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children. The result is an obvious pressure upon children to attend.[18] Again, while the Champaign school population represents only a fraction of the more than two hundred and fifty sects of the nation, not even all the practicing sects in Champaign are willing or able to provide religious instruction. The children belonging to these non-participating sects will thus have inculcated in them a feeling of separatism when the school should be the training ground for habits of community, or they will have religious instruction in a faith which is not that of

---

[18] It deserves notice that in discussing with the relator her son's inability to get along with his classmates, one of his teachers suggested that "allowing him to take the religious education course might help him to become a member of the group."

their parents. As a result, the public school system of Champaign actively furthers inculcation in the religious tenets of some faiths, and in the process sharpens the consciousness of religious differences at least among some of the children committed to its care. These are consequences not amenable to statistics. But they are precisely the consequences against which the Constitution was directed when it prohibited the Government common to all from becoming embroiled, however innocently, in the destructive religious conflicts of which the history of even this country records some dark pages.[19]

Mention should not be omitted that the integration of religious instruction within the school system as practiced in Champaign is supported by arguments drawn from educational theories as diverse as those derived from Catholic conceptions and from the writings of John Dewey.[20] Movements like "released time" are seldom

[19] The divergent views expressed in the briefs submitted here on behalf of various religious organizations, as *amici curiae,* in themselves suggest that the movement has been a divisive and not an irenic influence in the community: The American Unitarian Association; The General Conference of Seventh Day Adventists; The Joint Conference Committee on Public Relations set up by the Southern Baptist Convention, The Northern Baptist Convention, The National Baptist Convention Inc., and the National Baptist Convention; The Protestant Council of the City of New York; and The Synagogue Council of America and National Community Relations Advisory Council.

[20] There is a prolific literature on the educational, social and religious merits of the "released time" movement. In support of "released time" the following may be mentioned: The International Council of Religious Education, and particularly the writings of Dr. Erwin L. Shaver, for some years Director of its Department of Weekday Religious Education, in publications of the Council and in numerous issues of The International Journal of Religious Education (*e. g., They Reach One-Third,* Dec., 1943, p. 11; *Weekday Religious Education Today,* Jan., 1944, p. 6), and Religious Education (*e. g., Survey of Week-Day Religious Education,* Feb., 1922, p. 51; *The Movement for Weekday Religious Education,* Jan.–Feb., 1946, p. 6);

single in origin or aim. Nor can the intrusion of religious instruction into the public school system of Champaign be minimized by saying that it absorbs less than an hour a week; in fact, that affords evidence of

see also Information Service, Federal Council of Churches of Christ, May 29, 1943. See also Cutton, *Answering the Arguments,* The International Journal of Religious Education, June, 1930, p. 9, and *Released Time, id.,* Sept., 1942, p. 12; Hauser, *"Hands Off the Public School?",* Religious Education, Mar.–Apr., 1942, p. 99; Collins, *Release Time for Religious Instruction,* National Catholic Education Association Bulletin, May, 1945, pp. 21, 27–28; Weigle, *Public Education and Religion,* Religious Education, Apr.–June, 1940, p. 67; Nicholas Murray Butler, *The Place of Religious Instruction in Our Educational System,* 7 Vital Speeches 167 (Nov. 28, 1940); Howlett, *Released Time for Religious Education in New York City,* 64 Education 523, May, 1944; Blair, *A Case for the Weekday Church School,* 7 Frontiers of Democracy 75, Dec. 15, 1940; cf. Allred, Legal Aspects of Release Time (National Catholic Welfare Conference, 1947). Favorable views are also cited in the studies in note 17, *supra.* Many not opposed to "released time" have declared it "hardly enough" or "pitifully inadequate." *E. g.,* Fleming, God in Our Public Schools (2d ed. 1944) pp. 80–86; Howlett, *Released Time for Religious Education in New York City,* Religious Education, Mar.–Apr., 1942, p. 104; Cavert, *Points of Tension Between Church and State in America Today,* in Church and State in the Modern World (1937) 161, 168; F. E. Johnson, The Church and Society (1935) 125; Hubner, Professional Attitudes toward Religion in the Public Schools of the United States Since 1900 (1944) 108–109, 113; cf. Ryan, *A Protestant Experiment in Religious Education,* The Catholic World, June, 1922; Elliott, *Are Weekday Church Schools the Solution?,* The International Journal of Religious Education, Nov., 1940, p. 8; Elliott, *Report of the Discussion,* Religious Education, July–Sept., 1940, p. 158.

For opposing views, see V. T. Thayer, Religion in Public Education (1947) cc. VII, VIII; Moehlman, The Church as Educator (1947) c. X; Chave, A Functional Approach to Religious Education (1947) 104–107; A. W. Johnson, The Legal Status of Church-State Relationships in the United States (1934) 129–130; Newman, The Sectarian Invasion of Our Public Schools (1925). See also Payson Smith, *The Public Schools and Religious Education,* in Religion and Education

a design constitutionally objectionable. If it were merely a question of enabling a child to obtain religious instruction with a receptive mind, the thirty or forty-five minutes could readily be found on Saturday or Sunday. If that were all, Champaign might have drawn upon the French system, known in its American manifestation as "dismissed time," whereby one school day is shortened to allow all children to go where they please, leaving those who so desire to go to a religious school.[21] The momentum of the whole school atmosphere and school planning is presumably put behind religious instruction, as given in Champaign, precisely in order to secure for the religious

(Sperry, Editor, 1945) 32, 42–47; Herrick, *Religion in the Public Schools of America*, 46 Elementary School Journal 119, Nov., 1945; Kallen, *Churchmen's Claims on the Public School*, The Nation's Schools, May, 1942, p. 49; June, 1942, p. 52. And cf. John Dewey, *Religion in Our Schools* (1908), reprinted in 2 Characters and Events (1929) 504, 508, 514. "Released time" was introduced in the public schools of the City of New York over the opposition of organizations like the Public Education Association and the United Parents Associations.

The arguments and sources pro and con are collected in Hubner, Professional Attitudes toward Religion in the Public Schools in the United States since 1900 (1944) 94 *et seq.* And see the symposia, *Teaching Religion in a Democracy*, The International Journal of Religious Education, Nov., 1940, pp. 6–16; *The Aims of Week-Day Religious Education*, Religious Education, Feb., 1922, p. 11; *Released Time in New York City, id.*, Jan.–Feb., 1943, p. 15; *Progress in Weekday Religious Education, id.*, Jan.–Feb., 1946, p. 6; *Can Our Public Schools Do More about Religion?*, 125 Journal of Education 245, Nov., 1942, *id.* at 273, Dec., 1942; *Religious Instruction on School Time*, 7 Frontiers of Democracy 72–77, Dec. 15, 1940; and the articles in 64 Education 519 *et seq.*, May, 1944.

[21] See note 14, *supra*. Indications are that "dismissed time" is used in an inconsiderable number of the communities employing released time. Davis, Weekday Classes in Religious Education, U. S. Office of Education Bulletin 1941, No. 3, p. 22; Shaver, *The Movement for Weekday Religious Education*, Religious Education, Jan.–Feb., 1946, pp. 6, 9.

instruction such momentum and planning. To speak of "released time" as being only half or three quarters of an hour is to draw a thread from a fabric.

We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as "released time," present situations differing in aspects that may well be constitutionally crucial. Different forms which "released time" has taken during more than thirty years of growth include programs which, like that before us, could not withstand the test of the Constitution; others may be found unexceptionable. We do not now attempt to weigh in the Constitutional scale every separate detail or various combination of factors which may establish a valid "released time" program. We find that the basic Constitutional principle of absolute Separation was violated when the State of Illinois, speaking through its Supreme Court, sustained the school authorities of Champaign in sponsoring and effectively furthering religious beliefs by its educational arrangement.

Separation means separation, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a "wall of separation," not of a fine line easily overstepped. The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart. "The great American principle of eternal separation"—Elihu Root's phrase bears repetition—is one of the vital reliances of our Constitutional system for assuring unities among our people stronger than our diversities. It is the Court's duty to enforce this principle in its full integrity.

We renew our conviction that "we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion." *Everson* v. *Board of Education,* 330 U. S. at 59. If nowhere else, in the relation between Church and State, "good fences make good neighbors."

Mr. Justice Jackson, concurring.

I join the opinion of Mr. Justice Frankfurter, and concur in the result reached by the Court, but with these reservations: I think it is doubtful whether the facts of this case establish jurisdiction in this Court, but in any event that we should place some bounds on the demands for interference with local schools that we are empowered or willing to entertain. I make these reservations a matter of record in view of the number of litigations likely to be started as a result of this decision.

A Federal Court may interfere with local school authorities only when they invade either a personal liberty or a property right protected by the Federal Constitution. Ordinarily this will come about in either of two ways:

*First.* When a person is required to submit to some religious rite or instruction or is deprived or threatened with deprivation of his freedom for resisting such unconstitutional requirement. We may then set him free or enjoin his prosecution. Typical of such cases was *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624. There penalties were threatened against both parent and child for refusal of the latter to perform a compulsory ritual which offended his convictions. We intervened to shield them against the penalty. But here, complainant's son may join religious classes if he chooses and if his parents so request, or he may stay out of them. The complaint is that when others join and he does not, it sets him apart as a dissenter, which is humiliating.

Even admitting this to be true, it may be doubted whether the Constitution which, of course, protects the right to dissent, can be construed also to protect one from the embarrassment that always attends nonconformity, whether in religion, politics, behavior or dress. Since no legal compulsion is applied to complainant's son himself and no penalty is imposed or threatened from which we may relieve him, we can hardly base jurisdiction on this ground.

*Second.* Where a complainant is deprived of property by being taxed for unconstitutional purposes, such as directly or indirectly to support a religious establishment. We can protect a taxpayer against such a levy. This was the *Everson Case,* 330 U. S. 1, as I saw it then and see it now. It was complained in that case that the school treasurer drew a check on public funds to reimburse parents for a child's bus fare if he went to a Catholic parochial school or a public school, but not if he went to any other private or denominational school. Reference to the record in that case will show that the School District was not operating busses, so it was not a question of allowing Catholic children to ride publicly owned busses along with others, in the interests of their safety, health or morals. The child had to travel to and from parochial school on commercial busses like other paying passengers and all other school children, and he was exposed to the same dangers. If it could, in fairness, have been said that the expenditure was a measure for the protection of the safety, health or morals of youngsters, it would not merely have been constitutional to grant it; it would have been unconstitutional to refuse it to any child merely because he was a Catholic. But in the *Everson Case* there was a direct, substantial and measurable burden on the complainant as a taxpayer to raise funds that were used to subsidize transportation to parochial schools. Hence, we

had jurisdiction to examine the constitutionality of the levy and to protect against it if a majority had agreed that the subsidy for transportation was unconstitutional.

In this case, however, any cost of this plan to the taxpayers is incalculable and negligible. It can be argued, perhaps, that religious classes add some wear and tear on public buildings and that they should be charged with some expense for heat and light, even though the sessions devoted to religious instruction do not add to the length of the school day. But the cost is neither substantial nor measurable, and no one seriously can say that the complainant's tax bill has been proved to be increased because of this plan. I think it is doubtful whether the taxpayer in this case has shown any substantial property injury.

If, however, jurisdiction is found to exist, it is important that we circumscribe our decision with some care. What is asked is not a defensive use of judicial power to set aside a tax levy or reverse a conviction, or to enjoin threats of prosecution or taxation. The relief demanded in this case is the extraordinary writ of mandamus to tell the local Board of Education what it must do. The prayer for relief is that a writ issue against the Board of Education "ordering it to immediately adopt and enforce rules and regulations prohibiting all instruction in and teaching of religious education in all public schools . . . and in all public school houses and buildings in said district when occupied by public schools." The plaintiff, as she has every right to be, is an avowed atheist. What she has asked of the courts is that they not only end the "released time" plan but also ban every form of teaching which suggests or recognizes that there is a God. She would ban all teaching of the Scriptures. She especially mentions as an example of invasion of her rights "having pupils learn and recite such statements as, 'The Lord is my Shepherd, I shall not want.'" And she objects to teaching that the King James version of the Bible "is

called the Christian's Guide Book, the Holy Writ and the Word of God," and many other similar matters. This Court is directing the Illinois courts generally to sustain plaintiff's complaint without exception of any of these grounds of complaint, without discriminating between them and without laying down any standards to define the limits of the effect of our decision.

To me, the sweep and detail of these complaints is a danger signal which warns of the kind of local controversy we will be required to arbitrate if we do not place appropriate limitation on our decision and exact strict compliance with jurisdictional requirements. Authorities list 256 separate and substantial religious bodies to exist in the continental United States. Each of them, through the suit of some discontented but unpenalized and untaxed representative, has as good a right as this plaintiff to demand that the courts compel the schools to sift out of their teaching everything inconsistent with its doctrines. If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits.

While we may and should end such formal and explicit instruction as the Champaign plan and can at all times prohibit teaching of creed and catechism and ceremonial and can forbid forthright proselyting in the schools, I think it remains to be demonstrated whether it is possible, even if desirable, to comply with such demands as plaintiff's completely to isolate and cast out of secular education all that some people may reasonably regard as religious instruction. Perhaps subjects such as mathematics, physics or chemistry are, or can be, completely secularized. But it would not seem practical to teach either practice or appreciation of the arts if we are to forbid ex-

posure of youth to any religious influences. Music without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view. Yet the inspirational appeal of religion in these guises is often stronger than in forthright sermon. Even such a "science" as biology raises the issue between evolution and creation as an explanation of our presence on this planet. Certainly a course in English literature that omitted the Bible and other powerful uses of our mother tongue for religious ends would be pretty barren. And I should suppose it is a proper, if not an indispensable, part of preparation for a worldly life to know the roles that religion and religions have played in the tragic story of mankind. The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything which gives meaning to life, is saturated with religious influences, derived from paganism, Judaism, Christianity—both Catholic and Protestant—and other faiths accepted by a large part of the world's peoples. One can hardly respect a system of education that would leave the student wholly ignorant of the currents of religious thought that move the world society for a part in which he is being prepared.

But how one can teach, with satisfaction or even with justice to all faiths, such subjects as the story of the Reformation, the Inquisition, or even the New England effort to found "a Church without a Bishop and a State without a King," is more than I know. It is too much to expect that mortals will teach subjects about which their contemporaries have passionate controversies with the detachment they may summon to teaching about remote subjects such as Confucius or Mohammed. When instruction turns to proselyting and imparting knowledge becomes evangelism is, except in the crudest cases, a subtle inquiry.

The opinions in this case show that public educational authorities have evolved a considerable variety of practices in dealing with the religious problem. Neighborhoods differ in racial, religious and cultural compositions. It must be expected that they will adopt different customs which will give emphasis to different values and will induce different experiments. And it must be expected that, no matter what practice prevails, there will be many discontented and possibly belligerent minorities. We must leave some flexibility to meet local conditions, some chance to progress by trial and error. While I agree that the religious classes involved here go beyond permissible limits, I also think the complaint demands more than plaintiff is entitled to have granted. So far as I can see this Court does not tell the State court where it may stop, nor does it set up any standards by which the State court may determine that question for itself.

The task of separating the secular from the religious in education is one of magnitude, intricacy and delicacy. To lay down a sweeping constitutional doctrine as demanded by complainant and apparently approved by the Court, applicable alike to all school boards of the nation, "to immediately adopt and enforce rules and regulations prohibiting all instruction in and teaching of religious education in all public schools," is to decree a uniform, rigid and, if we are consistent, an unchanging standard for countless school boards representing and serving highly localized groups which not only differ from each other but which themselves from time to time change attitudes. It seems to me that to do so is to allow zeal for our own ideas of what is good in public instruction to induce us to accept the role of a super board of education for every school district in the nation.

It is idle to pretend that this task is one for which we can find in the Constitution one word to help us as judges to decide where the secular ends and the sectarian

begins in education. Nor can we find guidance in any other legal source. It is a matter on which we can find no law but our own prepossessions. If with no surer legal guidance we are to take up and decide every variation of this controversy, raised by persons not subject to penalty or tax but who are dissatisfied with the way schools are dealing with the problem, we are likely to have much business of the sort. And, more importantly, we are likely to make the legal "wall of separation between church and state" as winding as the famous serpentine wall designed by Mr. Jefferson for the University he founded.

MR. JUSTICE REED, dissenting.

The decisions reversing the judgment of the Supreme Court of Illinois interpret the prohibition of the First Amendment against the establishment of religion, made effective as to the states by the Fourteenth Amendment, to forbid pupils of the public schools electing, with the approval of their parents, courses in religious education. The courses are given, under the school laws of Illinois as approved by the Supreme Court of that state, by lay or clerical teachers supplied and directed by an interdenominational, local council of religious education.[1] The classes are held in the respective school buildings of the pupils at study or released time periods so as to avoid conflict with recitations. The teachers and supplies are paid for by the interdenominational group.[2] As I am

---

[1] The trial court found that: " 'The Champaign Council of Religious Education' [is] a voluntary association made up of the representatives of the Jewish, Roman Catholic and Protestant faiths in the school district."

[2] There is no extra cost to the state but as a theoretical accounting problem it may be correct to charge to the classes their comparable proportion of the state expense for buildings, operation and teachers. In connection with the classes, the teachers need only keep a record

convinced that this interpretation of the First Amendment is erroneous, I feel impelled to express the reasons for my disagreement. By directing attention to the many instances of close association of church and state in American society and by recalling that many of these relations are so much a part of our tradition and culture that they are accepted without more, this dissent may help in an appraisal of the meaning of the clause of the First Amendment concerning the establishment of religion and of the reasons which lead to the approval or disapproval of the judgment below.

The reasons for the reversal of the Illinois judgment, as they appear in the respective opinions, may be summarized by the following excerpts. The opinion of the Court, after stating the facts, says: "The foregoing facts, without reference to others that appear in the record, show the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education. . . . And it falls squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth) as we interpreted it in *Everson* v. *Board of Education,* 330 U. S. 1." Another opinion phrases it thus: "We do not now attempt to weigh in the Constitutional scale every separate detail or various combination of factors which may establish a valid 'released time' program. We find that the basic Constitutional principle of absolute separation was violated when the State of Illinois, speaking through its Supreme Court, sustained the school authorities of Champaign in sponsoring and effectively furthering religious beliefs by its educational arrangement." These expressions in the decisions seem to

---

of the pupils who attend. Increased custodial requirements are likewise nominal. It is customary to use school buildings for community activities when not needed for school purposes. See Ill. Rev. Stat., ch. 122, § 123.

leave open for further litigation variations from the Champaign plan. Actually, however, future cases must run the gantlet not only of the judgment entered but of the accompanying words of the opinions. I find it difficult to extract from the opinions any conclusion as to what it is in the Champaign plan that is unconstitutional. Is it the use of school buildings for religious instruction; the release of pupils by the schools for religious instruction during school hours; the so-called assistance by teachers in handing out the request cards to pupils, in keeping lists of them for release and records of their attendance; or the action of the principals in arranging an opportunity for the classes and the appearance of the Council's instructors? None of the reversing opinions say whether the purpose of the Champaign plan for religious instruction during school hours is unconstitutional or whether it is some ingredient used in or omitted from the formula that makes the plan unconstitutional.

From the tenor of the opinions I conclude that their teachings are that any use of a pupil's school time, whether that use is on or off the school grounds, with the necessary school regulations to facilitate attendance, falls under the ban. I reach this conclusion notwithstanding one sentence of indefinite meaning in the second opinion: "We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as 'released time,' present situations differing in aspects that may well be constitutionally crucial." The use of the words "cooperation," "fusion," "complete hands-off," "integrate" and "integrated" to describe the relations between the school and the Council in the plan evidences this. So does the interpretation of the word "aid." The criticized "momentum of the whole school atmosphere," "feeling of separatism" engendered in the non-participat-

ing sects, "obvious pressure . . . to attend," and "divisiveness" lead to the stated conclusion.  From the holding and the language of the opinions, I can only deduce that religious instruction of public school children during school hours is prohibited.  The history of American education is against such an interpretation of the First Amendment.

The opinions do not say in words that the condemned practice of religious education is a law respecting an establishment of religion contrary to the First Amendment.  The practice is accepted as a state law by all.  I take it that when the opinion of the Court says that "The operation of the state's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects" and concludes "This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith," the intention of its author is to rule that this practice is a law "respecting an establishment of religion."  That was the basis of *Everson* v. *Board of Education,* 330 U. S. 1.  It seems obvious that the action of the School Board in permitting religious education in certain grades of the schools by all faiths did not prohibit the free exercise of religion.  Even assuming that certain children who did not elect to take instruction are embarrassed to remain outside of the classes, one can hardly speak of that embarrassment as a prohibition against the free exercise of religion.  As no issue of prohibition upon the free exercise of religion is before us, we need only examine the School Board's action to see if it constitutes an establishment of religion.

The facts, as stated in the reversing opinions, are adequately set out if we interpret the abstract words used in the light of the concrete incidents of the record.  It is

correct to say that the parents "consented" to the religious instruction of the children, if we understand "consent" to mean the signing of a card like the one in the margin.[3] It is correct to say that "instructors were subject to the approval and supervision of the superintendent of schools," if it is understood that there were no definitive written rules and that the practice was as is shown in the excerpts from the findings below.[4]  The substance of the

[3] "CHAMPAIGN COUNCIL OF RELIGIOUS EDUCATION
1945-1946

Parent's Request Card

Please permit .......... .......... in Grade .. at ..........
School to attend a class in Religious Education one period a week under the Auspices of the Champaign Council of Religious Education.

(Check which)

Date ........ ....

( ) Interdenominational
( ) Protestant
( ) Roman Catholic
( ) Jewish

Signed .......... ..........
(Parent Name)

Parent's Church .......... ..........
Telephone No. .... .... Address .... ............

A fee of 25 cents a semester is charged each pupil to help cover the cost of material used.

If you wish your child to receive religious instruction, please sign this card and return to the school.

Mae Chapin, Director."

Mae Chapin, the Director, was not a school employee.

[4] "The superintendent testified that Jehovah's Witnesses or any other sect would be allowed to teach provided their teachers had proper educational qualifications, so that bad grammar, for instance, would not be taught to the pupils. A similar situation developed with reference to the Missouri Synod of the Lutheran Church. The evidence tends to show that during the course of the trial that group indicated it would affiliate with the Council of Religious Education.

"Before any faith or other group may obtain permission from the defendant for the similar, free and equal use of rooms in the public

religious education course is determined by the members of the various churches on the council, not by the superintendent.[5]   The evidence and findings set out in the two preceding notes convince me that the "approval and supervision" referred to above are not of the teachers and the course of studies but of the orderly presentation of the courses to those students who may elect the instruction. The teaching largely covered Biblical incidents.[6]   The religious teachers and their teachings, in every real sense,

---

school buildings said faith or group must make application to the superintendent of schools of said School District Number 71, who in turn will determine whether or not it is practical for said group to teach in said school system.

"The court feels from all the facts in the record that an honest attempt has been made and is being made to permit religious instruction to be given by qualified outside teachers of any sect to people of their own faith in the manner above outlined.   The evidence shows that no sect or religious group has ever been denied the right to use the schools in this manner."

[5] A finding reads: "The curriculum of studies in the Protestant classes is determined by a committee of the Protestant members of the council of religious education after consultation with representatives of all the different faiths included in said council.   The Jewish classes of course would deny the divinity of Jesus Christ.   The teaching in the Catholic classes of course explains to Catholic pupils the teaching of the Catholic religion, and are not shared by other students who are Protestants or Jews.   The teachings in the Protestant classes would undoubtedly, from the evidence, teach some doctrines that would not be accepted by the other two religions."

[6] It was found: "The testimony shows that sectarian differences between the sects are not taught or emphasized in the actual teaching as it is conducted in the schools.   The testimony of the religious education teachers, the secular teachers who testified, and the many children, mostly from Protestant families, who either took or did not take religious education courses, is to the effect that religious education classes have fostered tolerance rather than intolerance."

The Supreme Court of Illinois said: "The religious education courses do not go to the extent of being worship services and do not include prayers or the singing of hymns."   396 Ill. 14, 21, 71 N. E. 2d 161, 164.

244

were financed and regulated by the Council of Religious Education, not the School Board.

The phrase "an establishment of religion" may have been intended by Congress to be aimed only at a state church. When the First Amendment was pending in Congress in substantially its present form, "Mr. Madison said, he apprehended the meaning of the words to be, that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." [7] Passing years, however, have brought about acceptance of a broader meaning, although never until today, I believe, has this Court widened its interpretation to any such degree as holding that recognition of the interest of our nation in religion, through the granting, to qualified representatives of the principal faiths, of opportunity to present religion as an optional, extracurricular subject during released school time in public school buildings, was equivalent to an establishment of religion. A reading of the general statements of eminent statesmen of former days, referred to in the opinions in this case and in *Everson* v. *Board of Education, supra,* will show that circumstances such as those in this case were far from the minds of the authors. The words and spirit of those statements may be wholeheartedly accepted without in the least impugning the judgment of the State of Illinois.[8]

---

[7] 1 Annals of Congress 730.

[8] For example, Mr. Jefferson's striking phrase as to the "wall of separation between church and State" appears in a letter acknowledging "The affectionate sentiments of esteem and approbation" included in a testimonial to himself. In its context it reads as follows:

"Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of

Mr. Jefferson, as one of the founders of the University of Virginia, a school which from its establishment in 1819 has been wholly governed, managed and controlled by the State of Virginia,[9] was faced with the same problem that is before this Court today: the question of the constitutional limitation upon religious education in public schools. In his annual report as Rector, to the President and Directors of the Literary Fund, dated October 7, 1822, approved by the Visitors of the University of whom Mr. Madison was one,[10] Mr. Jefferson set forth his views at some length.[11] These suggestions of Mr. Jefferson were

religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State." 8 The Writings of Thomas Jefferson (Washington ed., 1861) 113.

[9] Acts of the Assembly of 1818–19 (1819) 15; *Phillips* v. *The Rector and Visitors of the University of Virginia,* 97 Va. 472, 474–75, 34 S. E. 66, 67.

[10] 19 The Writings of Thomas Jefferson (Memorial edition, 1904) 408, 409.

[11] *Id.,* pp. 414–17:

"It was not, however, to be understood that instruction in religious opinion and duties was meant to be precluded by the public authorities, as indifferent to the interests of society. On the contrary, the relations which exist between man and his Maker, and the duties resulting from those relations, are the most interesting and important to every human being, and the most incumbent on his study and investigation. The want of instruction in the various creeds of religious faith existing among our citizens presents, therefore, a chasm in a general institution of the useful sciences. . . . A remedy, however, has been suggested of promising aspect, which, while it excludes the public authorities from the domain of religious freedom, will give to the sectarian schools of divinity the full benefit the public provisions made for instruction in the other branches of science. . . . It has, therefore, been in contemplation, and suggested by some pious individuals, who perceive the advantages of associating other studies with those of religion, to establish their religious schools on the confines of the University, so as to give to their students ready and convenient access and attendance on the scientific lectures of the University; and to maintain, by that means, those destined for the religious professions on as high a standing of science, and of personal

adopted [12] and ch. II, § 1, of the Regulations of the University of October 4, 1824, provided that:

"Should the religious sects of this State, or any of them, according to the invitation held out to them, establish within, or adjacent to, the precincts of the University, schools for instruction in the religion of their sect, the students of the University will be free, and expected to attend religious worship at the establishment of their respective sects, in the morning, and in time to meet their school in the University at its stated hour." [13]

weight and respectability, as may be obtained by others from the benefits of the University. Such establishments would offer the further and greater advantage of enabling the students of the University to attend religious exercises with the professor of their particular sect, either in the rooms of the building still to be erected, and destined to that purpose under impartial regulations, as proposed in the same report of the commissioners, or in the lecturing room of such professor. . . . Such an arrangement would complete the circle of the useful sciences embraced by this institution, and would fill the chasm now existing, on principles which would leave inviolate the constitutional freedom of religion, the most inalienable and sacred of all human rights, over which the people and authorities of this state, individually and publicly, have ever manifested the most watchful jealousy: and could this jealousy be now alarmed, in the opinion of the legislature, by what is here suggested, the idea will be relinquished on any surmise of disapprobation which they might think proper to express."

Mr. Jefferson commented upon the report on November 2, 1822, in a letter to Dr. Thomas Cooper, as follows: "And by bringing the sects together, and mixing them with the mass of other students, we shall soften their asperities, liberalize and neutralize their prejudices, and make the general religion a religion of peace, reason, and morality." 12 Ford, *The Works of Thomas Jefferson*, (Fed. ed., 1905), 272.

[12] 3 Randall, Life of Thomas Jefferson (1858) 471.

[13] 19 The Writings of Thomas Jefferson (Memorial edition, 1904) 449.

Thus, the "wall of separation between church and State" that Mr. Jefferson built at the University which he founded did not exclude religious education from that school. The difference between the generality of his statements on the separation of church and state and the specificity of his conclusions on education are considerable. A rule of law should not be drawn from a figure of speech.

Mr. Madison's *Memorial and Remonstrance against Religious Assessments*,[14] relied upon by the dissenting Justices in *Everson,* is not applicable here.[15] Mr. Madison was one of the principal opponents in the Virginia General Assembly of *A Bill Establishing a Provision for Teachers of the Christian Religion.* The monies raised by the taxing section [16] of that bill were to be appropriated "by the Vestries, Elders, or Directors of each religious society, . . . to a provision for a Minister or Teacher

---

[14] The texts of the *Memorial and Remonstrance* and the bill against which it was aimed, to wit, *A Bill Establishing a Provision for Teachers of the Christian Religion* are set forth in *Everson* v. *Board of Education,* 330 U. S. 1, 28, 63–74.

[15] See, generally, the dissent of MR. JUSTICE RUTLEDGE, 330 U. S. 1, 28.

[16] 330 U. S. at 72–73:

"*Be it therefore enacted by the General Assembly,* That for the support of Christian teachers, per centum on the amount, or in the pound on the sum payable for tax on the property within this Commonwealth, is hereby assessed, and shall be paid by every person chargeable with the said tax at the time the same shall become due; and the Sheriffs of the several Counties shall have power to levy and collect the same in the same manner and under the like restrictions and limitations, as are or may be prescribed by the laws for raising the Revenues of this State.

"*And be it enacted,* That for every sum so paid, the Sheriff or Collector shall give a receipt, expressing therein to what society of Christians the person from whom he may receive the same shall direct the money to be paid, keeping a distinct account thereof in his books. . . ."

of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever . . . ." The conclusive legislative struggle over this act took place in the fall of 1785, before the adoption of the Bill of Rights. The *Remonstrance* had been issued before the General Assembly convened and was instrumental in the final defeat of the act, which died in committee. Throughout the *Remonstrance,* Mr. Madison speaks of the "establishment" sought to be effected by the act. It is clear from its historical setting and its language that the *Remonstrance* was a protest against an effort by Virginia to support Christian sects by taxation. Issues similar to those raised by the instant case were not discussed. Thus, Mr. Madison's approval of Mr. Jefferson's report as Rector gives, in my opinion, a clearer indication of his views on the constitutionality of religious education in public schools than his general statements on a different subject.

This Court summarized the amendment's accepted reach into the religious field, as I understand its scope, in *Everson* v. *Board of Education, supra.* The Court's opinion quotes the gist of the Court's reasoning in *Everson.* I agree, as there stated, that none of our governmental entities can "set up a church." I agree that they cannot "aid" all or any religions or prefer one "over another." But "aid" must be understood as a purposeful assistance directly to the church itself or to some religious group or organization doing religious work of such a character that it may fairly be said to be performing ecclesiastical functions. "Prefer" must give an advantage to one "over another." I agree that pupils cannot "be released in part from their legal duty" of school attendance upon condition that they attend religious classes. But as Illinois has held that it is within the discretion of the School Board to permit absence from school for religious instruc-

tion no legal duty of school attendance is violated. 396 Ill. 14, 71 N. E. 2d 161. If the sentence in the Court's opinion, concerning the pupils' release from legal duty, is intended to mean that the Constitution forbids a school to excuse a pupil from secular control during school hours to attend voluntarily a class in religious education, whether in or out of school buildings, I disagree. Of course, no tax can be levied to support organizations intended "to teach or practice religion." I agree too that the state cannot influence one toward religion against his will or punish him for his beliefs. Champaign's religious education course does none of these things.

It seems clear to me that the "aid" referred to by the Court in the *Everson* case could not have been those incidental advantages that religious bodies, with other groups similarly situated, obtain as a by-product of organized society. This explains the well-known fact that all churches receive "aid" from government in the form of freedom from taxation. The *Everson* decision itself justified the transportation of children to church schools by New Jersey for safety reasons. It accords with *Cochran* v. *Louisiana State Board of Education,* 281 U. S. 370, where this Court upheld a free textbook statute of Louisiana against a charge that it aided private schools on the ground that the books were for the education of the children, not to aid religious schools. Likewise the National School Lunch Act aids all school children attending tax-exempt schools.[17] In *Bradfield* v. *Roberts,* 175 U. S. 291, this Court held proper the payment of money by the Federal Government to build an addition to a hospital, chartered by individuals who were members of a Roman Catholic sisterhood, and operated under the auspices of the Roman Catholic Church. This was done over the objection that it aided the establish-

---

[17] 60 Stat. 230, ch. 281, §§ 4, 11 (d) (3).

ment of religion.[18]　While obviously in these instances the respective churches, in a certain sense, were aided, this Court has never held that such "aid" was in violation of the First or Fourteenth Amendment.

Well-recognized and long-established practices support the validity of the Illinois statute here in question.　That statute, as construed in this case, is comparable to those in many states.[19]　All differ to some extent.　New York may be taken as a fair example.[20]　In many states the pro-

---

[18] See *Selective Draft Law Cases*, 245 U. S. 366, 390; *Quick Bear* v. *Leupp*, 210 U. S. 50.

[19] Ed. Code of Cal. (Deering, 1944) § 8286; 6 Ind. Stat. Ann. (Burns, 1933) 1945 Supp. § 28–505a; 1 Code of Iowa ch. 299, § 299.2 (1946); Ky. Rev. Stat. (1946) § 158.220; 1 Rev. Stat. of Maine (1944) ch. 37, § 131; 2 Ann. Laws of Mass. (1945) ch. 76, § 1; Minn. Stat. (1945) § 132.05; N. Y. Education Law § 3210 (1); 8 Ore. Comp. Laws Ann. (1940) § 111–3014; 24 Pa. Stat. Ann. (Purdon, 1930) 1947 Supp. § 1563; 1 Code of S. D. (1939) § 15.3202; 1 Code of W. Va. (1943) § 1847.

[20] Education Law § 3210 (1) provides that: "a. A minor required by the provisions of part one of this article to attend upon instruction shall attend regularly as prescribed where he resides or is employed, for the entire time the appropriate public schools or classes are in session and shall be subordinate and orderly while so attending.

"b. Absence for religious observance and education shall be permitted under rules that the commissioner shall establish."

Acting under the authority of the New York law, the State Commissioner of Education issued, on July 4, 1940, these regulations:

"1 Absence of a pupil from school during school hours for religious observance and education to be had outside the school building and grounds will be excused upon the request in writing signed by the parent or guardian of the pupil.

"2 The courses in religious observance and education must be maintained and operated by or under the control of a duly constituted religious body or of duly constituted religious bodies.

"3 Pupils must be registered for the courses and a copy of the registration filed with the local public school authorities.

"4 Reports of attendance of pupils upon such courses shall be filed with the principal or teacher at the end of each week.

"5 Such absence shall be for not more than one hour each week

gram is under the supervision of a religious council composed of delegates who are themselves communicants of various faiths.[21]   As is shown by *Bradfield* v. *Roberts, supra,* the fact that the members of the council have religious affiliations is not significant.   In some, instruc-

at the close of a session at a time to be fixed by the local school authorities.

"6 In the event that more than one school for religious observance and education is maintained in any district, the hour for absence for each particular public school in such district shall be the same for all such religious schools."

On November 13, 1940, rules to govern the released time program of the New York City schools were adopted by the Board of Education of the City of New York.   Under these rules the practice of the religious education program is this: classes in religious education are to be held outside of school buildings; establishment of the program rests in the initiative of the church and home; enrollment is voluntary and accomplished by this technique: the church distributes cards to the parents and these are filled out and presented to the school; records of enrollment and arrangements for release are handled by school authorities; discipline is the responsibility of the church; and children who do not attend are kept at school and given other work.   See Rules of the Board of Education of the City of New York adopted Nov. 13, 1940; Public Education Association, *Released Time for Religious Education in New York City's Schools* (1943) ; *id.* (1945).

Constitutional approval by the New York Court of Appeals of these practices was given before the passage of Education Law § 3210 (1).   *People ex rel. Lewis* v. *Graves,* 245 N. Y. 195, 156 N. E. 663.

[21] The New York City program is supervised by The Greater New York Coordinating Committee on Released Time, a group of laymen drawn from Jews, Protestants and Roman Catholics.   This Committee is an example of a broad national effort to bring about religious education of children through cooperative action of schools and groups of members of various religious denominations.   The methods vary in different states and cities but are basically like the work of the New York City Committee.   See *Brief Sketches of Weekday Church Schools,* Department of Weekday Religious Education, International Council of Religious Education, Chicago, Illinois (1944).

tion is given outside of the school buildings; in others, within these buildings. Metropolitan centers like New York usually would have available quarters convenient to schools. Unless smaller cities and rural communities use the school building at times that do not interfere with recitations, they may be compelled to give up religious education. I understand that pupils not taking religious education usually are given other work of a secular nature within the schools.[22] Since all these states use the facilities of the schools to aid the religious education to some extent, their desire to permit religious education to school children is thwarted by this Court's judgment.[23] Under it, as I understand its language, children cannot be released or dismissed from school to attend classes in religion while other children must remain to pursue secular education. Teachers cannot keep the records as to which pupils are to be dismissed and which retained. To do so is said to be an "aid" in establishing religion; the use of public money for religion.

Cases running into the scores have been in the state courts of last resort that involved religion and the schools. Except where the exercises with religious significance partook of the ceremonial practice of sects or groups, their

---

[22] See note 20 *supra.*

[23] The use of school buildings is not unusual. See Davis, *Weekday Classes in Religious Education,* U. S. Office of Education (Bulletin 1941, No. 3) 27; National Education Association, *The State and Sectarian Education,* Research Bulletin (Feb. 1946) 36. The International Council of Religious Education advises that church buildings be used if possible. Shaver, *Remember the Weekday,* International Council of Religious Education (1946).

"Today, approximately two thousand communities in all but two states provide religious education in cooperation with the public schools for more than a million and a half of pupils." Shaver, *The Movement for Weekday Religious Education,* Religious Education (Jan.–Feb. 1946), p. 7.

constitutionality has been generally upheld.[24] Illinois itself promptly struck down as violative of its own constitution required exercises partaking of a religious ceremony. *People ex rel. Ring* v. *Board of Education,* 245 Ill. 334, 92 N. E. 251. In that case compulsory religious exercises—a reading from the King James Bible, the Lord's Prayer and the singing of hymns—were forbidden as "worship services." In this case, the Supreme Court of Illinois pointed out that in the *Ring* case, the activities in the school were ceremonial and compulsory; in this, voluntary and educational. 396 Ill. 14, 20–21, 71 N. E. 2d 161, 164.

The practices of the federal government offer many examples of this kind of "aid" by the state to religion. The Congress of the United States has a chaplain for each House who daily invokes divine blessings and guidance for

---

[24] Many uses of religious material in the public schools in a manner that has some religious significance have been sanctioned by state courts. These practices have been permitted: reading selections from the King James Bible without comment; reading the Bible and repeating the Lord's Prayer; teaching the Ten Commandments; saying prayers; and using textbooks based upon the Bible and emphasizing its fundamental teachings. When conducted in a sectarian manner reading from the Bible and singing hymns in the school's morning exercise have been prohibited as has using the Bible as a textbook. There is a conflict of authority on the question of the constitutionality of wearing religious garb while teaching in the public schools. It has been held to be constitutional for school authorities to prohibit the reading of the Bible in the public schools. There is a conflict of authority on the constitutionality of the use of public school buildings for religious services held outside of school hours. The constitutionality, under state constitutions, of furnishing free textbooks and free transportation to parochial school children is in conflict. See *Nichols* v. *Henry,* 301 Ky. 434, 191 S. W. 2d 930; *Findley* v. *City of Conneaut,* 12 Ohio Supp. 161. The earlier cases are collected in 5 A. L. R. 866 and 141 A. L. R. 1144.

the proceedings.[25]    The armed forces have commissioned chaplains from early days.[26]    They conduct the public services in accordance with the liturgical requirements of their respective faiths, ashore and afloat, employing for the purpose property belonging to the United States and dedicated to the services of religion.[27]    Under the Servicemen's Readjustment Act of 1944, eligible veterans may receive training at government expense for the ministry in denominational schools.[28]    The schools of the District of Columbia have opening exercises which "include a reading from the Bible without note or comment, and the Lord's prayer." [29]

In the United States Naval Academy and the United States Military Academy, schools wholly supported and completely controlled by the federal government, there are a number of religious activities.    Chaplains are attached to both schools.    Attendance at church services on Sunday is compulsory at both the Military and Naval Academies.[30]    At West Point the Protestant services are

[25] Rules of the House of Representatives (1943) Rule VII; Senate Manual (1947) 6, fn. 2.

[26] 3 Stat. 297 (1816).

[27] Army Reg., No. 60–5 (1944); U. S. Navy Reg. (1920), ch. 1, § 2 and ch. 34, §§ 1–2.

[28] 58 Stat. 289.

[29] Board of Education Rules, ch. VI, § 4.

[30] Reg. for the U. S. Corps of Cadets (1947) 47: "Attendance at chapel is part of a cadet's training; no cadet will be exempted.    Each cadet will receive religious training in one of the three principal faiths: Catholic, Protestant, or Jewish."    U. S. Naval Academy Reg., Art. 4301 (b): "Midshipmen shall attend church services on Sundays at the Naval Academy Chapel or at one of the regularly established churches in the city of Annapolis."

Morning prayers are also required at Annapolis.    U. S. Naval Academy Reg., Art. 4301 (a): "Daily, except on Sundays, a Chaplain will conduct prayers in the messhall, immediately before breakfast." Protestant and Catholic Chaplains take their turn in leading these prayers.

held in the Cadet Chapel, the Catholic in the Catholic Chapel, and the Jewish in the Old Cadet Chapel; at Annapolis only Protestant services are held on the reservation, midshipmen of other religious persuasions attend the churches of the city of Annapolis. These facts indicate that both schools since their earliest beginnings have maintained and enforced a pattern of participation in formal worship.

With the general statements in the opinions concerning the constitutional requirement that the nation and the states, by virtue of the First and Fourteenth Amendments,[31] may "make no law respecting an establishment of religion," I am in agreement. But, in the light of the meaning given to those words by the precedents, customs, and practices which I have detailed above, I cannot agree with the Court's conclusion that when pupils compelled by law to go to school for secular education are released from school so as to attend the religious classes, churches are unconstitutionally aided. Whatever may be the wisdom of the arrangement as to the use of the school buildings made with the Champaign Council of Religious Education, it is clear to me that past practice shows such cooperation between the schools and a non-ecclesiastical body is not forbidden by the First Amendment. When actual church services have always been permitted on government property, the mere use of the school buildings by a non-sectarian group for religious education ought not to be condemned as an establishment of religion. For a non-sectarian organization to give the type of instruction here offered cannot be said to violate our rule as to the establishment of religion by the state. The prohibition of enactments respecting the establishment of religion do

---

[31] The principles of the First Amendment were absorbed by the Fourteenth Amendment. *Pennekamp* v. *Florida,* 328 U. S. 331, 335.

not bar every friendly gesture between church and state. It is not an absolute prohibition against every conceivable situation where the two may work together, any more than the other provisions of the First Amendment—free speech, free press—are absolutes.[32]  If abuses occur, such as the use of the instruction hour for sectarian purposes, I have no doubt, in view of the *Ring* case, that Illinois will promptly correct them.  If they are of a kind that tend to the establishment of a church or interfere with the free exercise of religion, this Court is open for a review of any erroneous decision.  This Court cannot be too cautious in upsetting practices embedded in our society by many years of experience.  A state is entitled to have great leeway in its legislation when dealing with the important social problems of its population.[33]  A definite violation of legislative limits must be established.  The Constitution should not be stretched to forbid national customs in the way courts act to reach arrangements to avoid federal taxation.[34]  Devotion to the great principle of religious liberty should not lead us into a rigid interpretation of the constitutional guarantee that conflicts with accepted habits of our people.  This is an instance where, for me, the history of past practices is determinative of the meaning of a constitutional clause, not a decorous introduction to the study of its text.  The judgment should be affirmed.

---

[32] See *Whitney* v. *California,* 274 U. S. 357, 371; *Reynolds* v. *United States,* 98 U. S. 145, 166; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303; *Cox* v. *New Hampshire,* 312 U. S. 569, 574, 576; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 571; *Prince* v. *Massachusetts,* 321 U. S. 158.

[33] Cf. *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28.

[34] *Higgins* v. *Smith,* 308 U. S. 473; *Helvering* v. *Clifford,* 309 U. S. 331; *Comm'r* v. *Tower,* 327 U. S. 280; *Lusthaus* v. *Comm'r,* 327 U. S. 293.