# Bible Reading in Public Schools

WALTER E. ALESSANDRONI, Attorney General, August 26, 1963.—On June 17, 1963, in Abington School District v. Schempp, 374 U. S. 203, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963), the Supreme Court of the United States declared unconstitutional, under the Establishment Clause of the First Amendment to the United States Constitution, the Pennsylvania statute which requires the practice of beginning each school day with readings from the Holy Bible: section 1516 of the Public School Code of March 10, 1949, P. L. 30, as amended December 17, 1959, P. L. 1928, 24 PS §15-1516. The court simultaneously invalidated a rule of the Baltimore City Board of School Commissioners which required the recitation of the Lord's Prayer by the stu-

dents in unison in addition to the daily reading of Bible verses, as part of an opening exercise.

You have requested our opinion on the following questions:

1. What is the effect of the decision upon section 1516 of the Public School Code of 1949, which requires that at least ten verses from the Holy Bible be read without comment at the opening of each public school on each school day?

2. May a board of school directors or a school administrator require or permit the Bible to be read and/or the Lord's Prayer recited as part of an opening exercise in the public schools of the school district?

3. May a public school teacher require or permit Bible reading and/or recitation of the Lord's Prayer as part of an opening exercise in his classroom?

4. May Bible reading and/or Lord's Prayer recitation as part of an opening exercise be permitted for pupils who voluntarily wish it and whose parents request it in writing?

## Analysis of
## Abington School District v. Schempp

The majority opinion in the Abington case, delivered by Mr. Justice Clark, laid stress upon the fact that throughout American history our national life reflects a religious people and a close identification of religion with our history and government:

". . . The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, 'So help me God'. Likewise each House of the Congress provides through its Chaplain an opening prayer, and the sessions of this Court are

declared open by the crier in a short ceremony, the final phase of which invokes the grace of God . . .": 374 U. S. 203, 213.

The court cited precedents which held that neither a State nor the Federal government can set up a church, or pass laws which aid one religion, aid all religions, or prefer one religion over another, and that the purpose of the first amendment providing that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," was "to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion": Everson v. Board of Education, 330 U. S. 1 (1947) ; McCollum v. Board of Education, 333 U. S. 203 (1948).

In relating the Establishment and Free Exercise Clauses of the First Amendment, the court defined the requirement of "neutrality" with respect to religion and religious beliefs imposed upon the government, and stated: "In the relationship between man and religion, the state is firmly committed to a position of neutrality": 374 U. S. 203, 226.

The test for determining when the bounds of "neutrality" are breached and the scope of legislative power exceeded is stated to depend upon whether either the purpose or the primary effect of the law "is the advancement or inhibition of religion." In other words, "to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." The court applied this test to the facts of the cases before it and found that Bible reading and recitation of the Lord's Prayer conducted as part of a daily program of opening exercises held in public schools under the supervision and with the participation of teachers constituted a religious ceremony.

### Effect of the Supreme Court Decision upon the Pennsylvania Bible Reading Statute

The rule is well settled that an unconstitutional statute, though having the form and name of law, is in reality no law. Such a statute is void, and in legal contemplation is as inoperative as if it had never been passed. See 11 Am. Jur., Constitutional Law, §148, at pages 827-29. Thus, section 1516 of the Public School Code of 1949, having been declared unconstitutional by the Supreme Court of the United States, is absolutely void. As such, it cannot impose duties, create rights or confer legal power or authority on anyone.

### Discontinuance of the Bible Reading Practice

The second, third and fourth questions presented can be treated together for purposes of this opinion, since each involves the same issue, whether public school officials may require or permit Bible reading as a devotional, classroom exercise.

The ruling of the Supreme Court prohibits Bible reading in the public schools as a devotional exercise no matter who the sponsoring or supervising agent or agency. The fact that it was a school board rule of Baltimore which was stricken down in Murray v. Curlett, no. 119, October term, 1962, the companion case decided with Abington, clearly precludes school board action to accomplish by rule or regulation that which cannot be done by statute. Nothing appears in the various opinions of the Supreme Court to indicate that the strictures upon legislative and school board action do not equally bind school administrators and classroom teachers. In each situation it is the power, prestige and authority of the Commonwealth represented by school boards, administrators and teachers which would be made to subtly stand behind and sanction the conduct of the religious observances. This the First Amendment is held to forbid.

Further, it makes no legal difference that Bible reading as a devotional exercise is "permitted" rather than "required". The mere permission constitutes tacit approval and violates the concept of neutrality as defined by the Supreme Court. To permit group religious ceremony or activity in the public schools merely because it is not mandated would be inconsistent with the Supreme Court's decision. Its result would be a repudiation of the law of the land by subterfuge. Group Bible reading and prayer, therefore, as the practices have heretofore existed as devotional exercises or ritual in the public schools, cannot continue in the public schools, whether or not they are required or permitted by school boards, administrators or teachers, and whether or not the pupils engage in the practices voluntarily, or even with the express written consent of their parents.

### Conclusion

We are, therefore, of the opinion and you are accordingly advised that:

(1) Section 1516 of the Public School Code of March 10, 1949, P. L. 30, as amended December 17, 1959, P. L. 1928, 24 PS §15-1516, is unconstitutional and, therefore, absolutely void; and

(2) Group Bible reading and prayer, as the practices have heretofore existed as devotional exercises or ritual in the public schools of the Commonwealth, may no longer be conducted, whether or not they are required or permitted by school boards, administrators or teachers, and whether or not the pupils engage in the practices voluntarily, or even with the express written consent of their parents.

### Permissible Programs

In view of the foregoing, it becomes pertinent to consider what programs are permissible in the public schools.

The majority opinion and the separate concurring opinions of Mr. Justice Brennan and Mr. Justice Goldberg in the Abington case each call attention to methods and means whereby the secular ends and purposes sought to be obtained from devotional exercises employing Bible reading and prayer may be obtained without offending the First Amendment.

Secular ends and purposes such as those of fostering harmony and tolerance among the pupils, enhancing the discipline and authority of the teacher and inculcating moral values and ethical precepts might equally be served by methods other than devotional exercises. This would be consistent with the suggestion of Mr. Justice Brennan, where he stated:

". . . It has not been shown that readings from the speeches and messages of great Americans, for example, or from the documents of our heritage of liberty, daily recitation of the Pledge of Allegiance, or even the observance of a moment of reverent silence at the opening of class, may not adequately serve the solely secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government:" 374 U. S. 203, 281.

Referring specifically to nondevotional use of the Bible in the public schools, Mr. Justice Brennan further stated:

"The holding of the Court today plainly does not foreclose teaching *about* the Holy Scriptures or about the differences between religious sects in classes in literature or history. Indeed, whether or not the Bible is involved, it would be impossible to teach meaningfully many subjects in the social sciences or the humanities without some mention of religion. To what extent, and at what points in the curriculum religious materials should be cited, are matters which the courts ought to

entrust very largely to the experienced officials who superintend our Nation's public schools.": 374 U. S. 203, 300.

Teaching *about* religion as a substitute for Bible reading was encouraged in the majority opinion as follows:

". . . In addition, it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistent with the First Amendment. . . .": 374 U. S. 203, 225.

Mr. Justice Goldberg's concurring opinion, joined in by Mr. Justice Harlan, said this concerning teaching about religion:

"Neither the state nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political and personal values derive historically from religious teachings. Goverment must inevitably take cognizance of the existence of religion and, indeed, under certain circumstances the First Amendment may require that it do so. And it seems clear to me from the opinion in the present and past cases that the Court would recognize the propriety of providing military chaplains and of teaching *about* religion, as distinguished from the teaching *of* religion, in the public schools . . .": 374 U. S. 203, 306.

In view of the foregoing, the following nonreligious practices may be substituted lawfully in the public schools in place of corporate prayer and Bible reading without offending the First Amendment: daily recitation of the Pledge of Allegiance; a period of silent medi-

tation; readings from great literature, messages and speeches of great Americans and from other documents of our heritage; presentation of inspirational music, poetry and art; the objective study about religion as a cultural force; objective study of comparative religion or the history of religion; and Bible study for literary and historic qualities as part of a secular program of education.

It should be clear that nothing in the decision of the Supreme Court or in this opinion imposes ironclad limitations upon the mention of God, references to the Bible or teaching about religion in the public schools, nor is there any restraint about unorganized, private, personal prayer or Bible reading by pupils during free moments of the day which is not a part of the school program and does not interfere with the school schedule.