Kenneth **ROBERTS**; Marc Nelson and Zay Nelson, parents and next friends of Kelly Nelson and Amy Nelson; Debra Jean White, parent and next friend of Kelly White, Plaintiffs,

v.

Kathleen **MADIGAN**, in her official capacity as principal of Berkeley Gardens Elementary School, and Adams County School District No. 50, Defendants.

No. 88–F–1908.

United States District Court, D. Colorado.

Jan. 5, 1989.

Roger Westlund, Thornton, Colo., Cimron Campbell, Jordan Lorence, Washington, D.C., for Kenneth Roberts.

Martin Semple, Franklin A. Nachman, Denver, Colo., for Kathleen Madigan and School Dist. No. 50.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

Plaintiff Kenneth Roberts, a fifth grade teacher, is joined by parents of several children in his school in seeking injunctive and declaratory relief against officials of School District No. 50. Plaintiffs challenge defendants' removal of a Bible from the Berkeley Gardens Elementary School library and their removal of two religiously oriented books in Roberts' classroom library. Plaintiffs seek further relief from defendants' directive that Roberts keep his Bible out of sight, and refrain from silently reading it, during classroom hours.

Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and the First and Fourteenth Amendments to the Constitution. The hearing on the preliminary injunction was merged with the trial to the court pursuant to F.R.Civ.P. 65(a)(2).

Plaintiffs assert that defendants have abridged their First Amendment rights of Free Speech, Academic Freedom, and Access to Information. Plaintiffs further allege that defendants have violated the Establishment Clause of the First Amendment.[1]

---

1. The Establishment and Free Exercise Clauses refer to the following provision of the First Amendment: "Congress shall make no law re-

The parties in this litigation are as follows:

Plaintiff Kenneth Roberts, a fifth grade teacher at Berkeley Gardens Elementary School in Adams County School District No. 50, Westminster, Colorado.

Plaintiffs Marc and Zay Nelson, the parents of Plaintiffs Kelly and Amy Nelson, neither of whom is in Roberts' class. Kelly Nelson was a student in Roberts' class during the 1987–88 school term.

Plaintiff Debra Jean White, the parent of Plaintiff Kelly White, who is not in Roberts' class.

Defendant Kathleen Madigan, in her official capacity as principal of Berkeley Gardens Elementary School.

Defendant Adams County School District No. 50. ("the District").

By this Order, we hold that Roberts' request for injunctive relief is denied. We direct that the Bible be returned to the school library at Berkeley Gardens Elementary School, Adams County, Colorado. We further hold that parents whose children are not presently in Roberts' class have no standing to challenge the defendants' actions as to Roberts.

Accordingly, the court enters the following findings of fact and conclusions of law.

## I. *Facts*

Events giving rise to this litigation transpired during the school term from September of 1987 to June of 1988.

Roberts' testimony at trial revealed the following facts. During a parent/teacher open house in September of 1987, Madigan received a complaint from a parent regarding the presence of two books, *The Bible in Pictures* (Plaintiffs' Exhibit 5), and *The Life of Jesus* (Plaintiffs' Exhibit 6), in Roberts' classroom library. These books are not part of the District's approved curriculum for fifth grade students.[2]

Madigan quickly perused the books and directed Roberts to remove them from the classroom library. She also ordered that he take down a poster which was prominently displayed in the classroom. (Plaintiffs' Exhibit 7(a)).[3] Roberts complied with this directive immediately and without argument.

Madigan asked no questions regarding the books' use before ordering their removal. Her explanation to Roberts at the time was that "separation of church and state" required that the books be removed. Madigan then noticed the Bible which Roberts kept on his desk and requested that he keep it out of sight during classroom hours.[4]

Madigan had spoken to Roberts about the Bible on his desk on previous occasions. During a routine visit to Roberts' classroom, Madigan observed that Roberts was silently reading the Bible during a class session. Feeling that Roberts should have been actively teaching the class instead of silently reading, she directed him to keep the Bible in his desk between the hours of 8:00 and 3:30. Roberts claims that his reading was part of the lesson plan which he submitted to Madigan and which she approved. (Plaintiffs' Exhibit O). However, the lesson plan does not specifically provide that Roberts is to read during this

specting an establishment of religion, or prohibiting the free exercise thereof...."

The Free Speech clause refers to the following First Amendment provision: "Congress shall make no law ... abridging the freedom of speech, or of the press...."

**2.** *The Bible in Pictures* is a 319-page volume with over one thousand illustrations. The illustrations are designed to provide both children and adults with a better understanding of the Bible. In the book's preface, the author states "I pray that this book may bring a fresh vision of Christ, and God's purpose in Him, to you who now read it in the midst of the heartache and frustration of the modern world."

*The Story of Jesus* is a 128-page volume which depicts through illustrations and text the birth, life, and resurrection of Jesus Christ. The book concentrates on the teachings of Jesus of Nazareth with the underlying premise that he is the Son of God.

**3.** The poster depicts a mountain scene with the inscription: "You have only to open your eyes to see the hand of God". The removal of the poster is not contested in this case.

**4.** The Bible in question is the King James version published in 1968 by the National Publishing Company.

**1510**

period, nor that Madigan in any way approved his doing so.

Madigan saw Roberts reading the Bible in front of the students a second time and again directed him to keep the Bible out of sight during school hours. It was at this time that Madigan received the parents' complaint at the open house.

Roberts later questioned Madigan whether he should be required to "hide" the Bible, comparing his use of the Bible and the religious materials in his classroom to the pledge of allegiance, which contains the phrase "one nation under God". Madigan conferred with school officials after this discussion, and they affirmed her decision. Roberts asked for written guidelines as to what types of material he could keep in his classroom. Madigan denied this request, stating that common sense and her previous remarks were sufficient.

Roberts made a written request for the guidelines. (Plaintiffs' Exhibit 10). He subsequently met with other officials in the District, but to no avail. In response to the written request, Madigan again conferred with higher officials and legal counsel for the District. As a result of that meeting the following directive was issued to Roberts:

> The law is clear that religion may not be taught in a public school. To avoid the appearance of teaching religion, I have given you this directive. Failure to comply with this directive will be considered insubordination and could result in disciplinary action. (Plaintiffs' Exhibit 12).

Roberts' classroom library contains approximately 237 books of varying content, including *A Tale of Two Cities*, *Tom Sawyer*, and *The Prince and the Pauper*. (Plaintiffs' Exhibit 1). The books are made available to students for a daily fifteen-minute independent reading period. Students are free to choose the books which they read during this time and may bring books from home or other libraries.

Roberts reads his own books during the independent reading time, in order to "set an example to the students of an adult reading". (Complaint, paragraph 11). Frequently, the book he reads in front of the students is the Bible, which is left on his desk throughout the school day. Roberts testified that he never reads aloud from the Bible, nor proselytizes about his faith to the students. There are no allegations of personal hostility on the part of defendants toward plaintiffs' religious views.

The parties dispute whether Madigan removed the Bible from the Berkeley Gardens school library. Defendants do not seriously contest the replacement of the Bible in the school library; however, the Bible has yet to be replaced.

Specifically, the court confronts the following issues in this litigation: (1) Whether Roberts' actions constitute a violation of the Establishment Clause; (2) Whether the District's actions constitute a violation of Roberts' right to free speech and academic freedom; and (3) Whether the student plaintiffs and their parents have standing to challenge the District's actions toward Roberts.

## II. *The First Amendment*

At controversy in this case is the complex relationship between religion, public education, and the First Amendment.[5] When we speak of government in the context of this case, we include public education within its meaning. The term "secular" is used by its common definition.[6]

■ The First Amendment sets forth fundamental principles governing the reaches of government and religion, stating that *"Congress shall make no law respecting an Establishment of religion, or prohibiting the free exercise thereof...."*

**5.** For an overview of the often turbulent relationship between religion and public education, see Leo Pfeffer, God, Caesar and the Constitution (1975); Leo Pfeffer, Church, State, and Freedom (revised ed.) (1967); John H. Laubach, School Prayers (1969); Rodney K. Smith, Public Prayer and the Constitution (1984); William D. Valente, Education Law, Public and Private (1985); Kern Alexander and M. David Alexander, American Public School Law (2nd ed. 1985).

**6.** Webster's New International Dictionary (2d Ed.1950) defines secular as "not religious in character nor devoted to religious ends or uses".

(Emphasis added). There are thus two distinct provisions restricting and controlling government authority over religion: the Establishment Clause and the Free Exercise Clause. The Fourteenth Amendment, as interpreted by the Supreme Court, extends these limits on governmental power to state and local governments, including school districts, their officials, and employees.[7]

Constitutional debates over the role of religion in public education often involve a complex interplay between the Free Exercise and the Establishment Clauses.[8] Each clause serves a different purpose: the goal of the Free Exercise Clause is to keep religious faith voluntary—free from government coercion—while the goal of the Establishment Clause is to prevent excessive government involvement in religion.

The Free Exercise Clause prevents government from impairing the liberty of individuals to exercise their religious faith. The clause governs conflicts between religious faith and government actions that through coercion make it more difficult to hold the beliefs and engage in the practices of such faith. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). It provides absolute protection for freedom to hold religious beliefs but only qualified protection for freedom to engage in religious activities.

To resolve disputes over government interferences with religious faith, courts weigh the strength of a person's interest in exercising the beliefs and practices in question, against the government's interest in a policy which limits the exercise of faith, and the degree of burden imposed by the limitation. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). If a governmental policy interferes with the person's freedom to exercise his faith, the government agency must show that its interest in enforcing the policy is sufficiently compelling to override the person's religious rights and that the policy represents the least restrictive way of fulfilling the government's interest. *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1962).

The Establishment Clause mandates government neutrality concerning religion while unequivocally separating the reaches of church and state. The clause prohibits state or federal support of religion and defines the parameters of the relation between government and religion:

> Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of non-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion.

---

**7.** *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 215–16, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). ("The fundamental concept of liberties embodied in the [Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws."

**8.** The relationship of the Establishment and Free Exercise Clauses was first discussed in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Court stated that the

> "inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—the freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended. *Abington School Dist. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963).

*Epperson v. Arkansas,* 393 U.S. 97, 103–4, 89 S.Ct. 266, 269–70, 21 L.Ed.2d 228 (1968).

State activity in religious matters must pass a three-part test in order to comport with the Establishment Clause. The activity must:

(1) reflect a clearly secular purpose; (2) have a primary, as opposed to incidental, effect which neither promotes nor inhibits religion; (3) not foster excessive government entanglement with religion.

If the activity fails any one of the three parts, then a constitutional violation has taken place. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). At times it may appear that the above test results in uncertainty and ambiguous answers. However, it provides a workable analytic framework by which to review religious activities in public education.

█ Roberts does not bring his action under the Free Exercise Clause, but rather, bases it upon the Free Speech Clause. We consider Roberts' cause of action under both Clauses. Under the facts of this case, Roberts' choice of Clauses does not alter the results of an Establishment Clause analysis. The Supreme Court has stated that the various Clauses of the First Amendment are unified and interwoven together by the individual's right to freedom of conscience.[9] Both the Free Speech and Free Exercise Clauses protect the freedom to express religious views, yet both are subject to the strictures of the Establishment Clause.[10]

█ In public education, an individual's right to free speech is not absolute. It may be limited if exercise of that right materially and substantially interferes with the rights of others. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969). When such interference occurs, a constitutional conflict of the highest order is presented. *Breen v. Runkel,* 614 F.Supp. 355 (D.Mich.1985).

### III. *The Bible in the School Library*

█ Of particular importance in this litigation is the legal propriety of keeping the Bible in a school library. The Supreme Court has described the library as "a mighty resource in the marketplace of ideas". *Abrams v. United States,* 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J. dissenting). A school library "is a place dedicated to quiet, to knowledge, and to beauty." *Board of Education v. Pico,* 457 U.S. 853, 868, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1981) (citing *Brown v. Louisiana,* 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966). It is a place where "'students must always remain free to inquire, to study and to evaluate, to gain maturity and understanding." *Board of Education v. Pico,* 457 U.S. 853, 868–69, 102 S.Ct. at 2808–09 (citing *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

The school library is a mirror of the human race, a repository of the works of scientists, leaders, and philosophers. It is the locus where the past meets tomorrow, embellished by the present. The school library offers the student a range of knowledge, from the world's great novels and plays to books on hobbies and how-to-do-it projects. The importance of the school library is summed up by the inscription

---

9. "[I]t may be doubted that any of the great liberties insured by the First Amendment can be given a higher place than the others. All have preferred position in our basic scheme. *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). All are interwoven together. Differences there are, in them and in the modes appropriate for their exercise. But they have unity in the charter's prime place because they have unity in their human sources and functionings." *Wallace v. Jaffree,* 472 U.S. 38, 50 n. 35, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1984) (citing *Prince v. Massachu-* setts, 321 U.S. 158, 164, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944).

10. The Free Speech Clause clearly protects the rights of individuals to speak on religious topics. *Widmar v. Vincent,* 454 U.S. 263, 268–69, n. 6, 102 S.Ct. 269, 273–74, n. 6, 70 L.Ed.2d 440 (1981). However, those rights may be limited by the Establishment Clause. *Breen v. Runkle,* 614 F.Supp. 355 (D.Mich.1985), citing *Widmar,* 454 U.S. at 276, 102 S.Ct. at 277. The *Breen* case provides a discussion on some of the issues in this case.

above the entry to the University of Colorado's Norlin library: "Who knows only his own generation remains always a child."

In this age of enlightenment, it is inconceivable that the Bible should be excluded from a school library. The Bible is regarded by many to be a major work of literature, history, ethics, theology, and philosophy.[11] It has a legitimate, if not necessary, place in the American public school library. In this central location, it is available for voluntary perusal and study by young students possessing inquisitive minds. Youth is the time for students to explore great works of history and literature. To deprive a public school library's collection of the Bible would, in the language of Justice Robert Jackson, render the educational process "eccentric" and incomplete. *McCollum v. Board of Education*, 333 U.S. 203, 235, 67 S.Ct. 461, 465, 92 L.Ed. 649 (1949).

The Establishment Clause does not require that religious books be removed from the shelves of school libraries. *Abington School District v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). Public school libraries may include Bibles and other religiously oriented books provided that no one sect is favored in the library and their inclusion in the library's collection does not show any preference for religious works in general. *Evans v. Selma Union H.S. Dist.*, 193 Cal. 54, 222 P. 801 (1924). We find that the Berkeley Gardens library does not show any preference for a particular religion, or religion in general. The Bible has a legitimate place in its collection.

### IV. *Religious Books in the Classroom Library*

The Bible must be distinguished from secondary religious books such as those in Roberts' classroom library. Whereas the Bible is considered a major historical and literary work, *The Bible in Pictures* and *The Story of Jesus* are specifically written to provide children with a better religious understanding of the Christian interpretation of the Bible. As further discussed below, the Bible has many secular uses as a primary work and a source of reference. The books in question do not possess the same secular qualities.

Similarly, the school library must be distinguished from the classroom library. Joyce Bennett, the librarian at Berkeley Gardens, testified that the books in the school library are arranged according to subject, with the religious book section containing many volumes on various religions. (Defendants' Exhibit I).[12] In comparison, Roberts' classroom library has no arrangement by subject, with only the two books in question being religiously oriented. (Plaintiffs' Exhibit 1). This distinction mandates different constitutional results.

In the school library, a student may go directly to the religious section where he or she will find an assortment of books on various religions. The student selects books according to personal curiosity, out of the glare of teacher supervision and peer pressure. The voluntary nature of choice, combined with the variety and number of books, provides the student with protections against undue religious indoctrination. Roberts' classroom library does not afford the student the same protection and opportunity for individuality.

Attendance is compulsory in the classroom.[13] The teacher stands in a position of power as disciplinarian, role model, and educator. Students are constantly in the presence of their peers, who may observe their every action. The students are, in a real sense, a captive audience vulnerable to

---

**11.** See, eg., John H. Laubach, School Prayers, pp. 150–54 (1969).

**12.** The collection contains books on the Muslim, Jewish, Sikh, Hindu, and Buddhist faiths as well as several books on ancient Greek and European mythology. (Defendants' Exhibit I).

**13.** The potential for undue influence is far less significant with regard to college students who voluntarily enroll in courses. "This distinction warrants a difference in constitutional results." *Abington School Dist. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The Court has not questioned the authority of state colleges or universities to offer courses on theology or religion. See *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 273, 70 L.Ed.2d 440 (1981).

even silent forms of religious indoctrination.

This compulsion of circumstances in the classroom has been recognized by the Supreme Court and other courts.[14] The danger of indoctrinating students with, or unduly exposing them to, religious beliefs is much greater in the classroom than in the library. *See, Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). An Establishment Clause analysis must consider this heightened danger in order to "prevent as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

### V. *Religious Books in the Classroom/Standards for Injunctive Relief*

In order for this court to grant preliminary injunctive relief, the moving party must establish the following:

1. Substantial likelihood that the movant will eventually prevail on the merits;

2. Showing that the movant will suffer irreparable harm unless the injunction issues;

3. Proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

4. Showing that the injunction, if issued, would not be adverse to the public interest.

*Hartford House Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268 (10th Cir.) *cert. denied,* — U.S. —, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

The standard for permanent injunctive relief is essentially the same with the exception that the movant must demonstrate actual success on the merits. *Amoco Production Company, et al. v. Village of Gambell, Alaska, et al.,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Permanent injunctions are examined under less demanding standards than are preliminary injunctions. *Henson v. Hoth,* 258 F.Supp. 33 (D.Colo.1966).

Roberts' case for injunctive relief fails because he cannot demonstrate success on the merits. Roberts contends that defendants have violated the Establishment Clause by removing the books from his classroom library and barring him from reading or displaying the Bible. In determining whether there has been a violation of the Establishment Clause, the court must apply the three-part test outlined above. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). First Amendment issues are decided by the particular facts of a case. Trial courts must establish factually complete records before deciding such issues. *Breen v. Runkel,* 614 F.Supp. 355, 357 (D.Mich.1985).

Roberts argues that defendants based their actions on an erroneous interpretation of the Establishment Clause, and thus have no legitimate reason for their actions. School officials are charged with a difficult task in exercising their broad discretion in the management of school affairs.[15] They must balance the First Amendment rights of teachers to freely exercise and express their religious preferences with the First Amendment rights of students to be free of religious indoctrination in the classroom. School officials have an affirmative duty to ensure that individual teachers are not violating the Establishment Clause, *see, Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3224, 87 L.Ed.2d 267 (1985), but in carrying out this duty, they must remain within the "transcendent imperatives of the First Amendment". *Board of Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

There are no certain guidelines for school officials to follow in such cases. Supreme Court rulings are inquiries based on specif-

---

14. See, eg., *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *People ex rel. Ring v. Board of Education,* 245 Ill. 334, 92 N.E. 251 (1910); *State ex rel. Weiss v. District Board,* 76 Wisc. 177, 44 N.W. 967 (1890).

15. *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

ic facts, and the majority of the cases are by divided courts and lack unanimity. *See, e.g., Abington School Dist. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

■ Roberts alleges that the District's purpose in removing the two religious books from his classroom library was to "disapprove religious books in that school." The record reflects, however, that the District's action was prompted by a secular, non-religious purpose. Madigan testified at trial that she directed the removal of the books only after parents complained to her at an open house. (Defendants' Exhibit A). The final decision to remove the books was made after consultation with school officials and legal counsel for the District as to Establishment Clause implications. We are persuaded that the District's purpose in the removal of the books was to promote religious neutrality according to the mandates of the Establishment Clause.

■ The record shows that the District's actions as to Roberts' reading of the Bible and his leaving it in open view on his desk were motivated by a secular purpose. Defendants were not seeking to advance other religions over Roberts', but were merely performing their "affirmative duty to ensure that individual teachers are not, through their classroom conduct, violating the guidelines of the Establishment Clause." *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973).

Madigan, as principal of Berkeley Gardens and Roberts' direct superior, is empowered to regulate Roberts' classroom conduct.[16] We do not find an improper, non-secular purpose behind her decision that Roberts should have been teaching instead of reading during the independent reading period. As to her order that he keep the Bible out of the view of the students during the day, there is nothing in the record to suggest that her purpose went beyond that of insulating the students from undue exposure to Roberts' religious beliefs.

■ In light of the record, it is Roberts' conduct which appears to be motivated by religious purposes. As noted, the religious books in his classroom library were not related to the approved curriculum for fifth graders. Roberts never used the books for the study of any secular course of study, such as history, civilization, ethics or comparative religion. Roberts never claimed that his personal use of the Bible was non-religious. The record contains nothing to suggest that Roberts had a non-religious purpose in placing the books in the classroom library, or in reading the Bible during classroom hours. In light of these circumstances, we conclude that there was an improper religious purpose behind Roberts' use of the Bible and the presence of the religious books in his classroom library.

■ The primary effect of the District's actions was neither to advance nor inhibit religion. Roberts claims that the District's actions are a showing of hostility toward religion which, in effect, is a furtherance of the "religion of secularism". *See, Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). This argument is not persuasive.[17] The District made no at-

---

16. The Supreme Court has noted:
   Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate constitutional values. *Epperson v. Arkansas,* 393 U.S. 97, 104–05, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

17. Leo Pfeffer states: "A secular state requires a secular state school; but the secularization of the state does not mean secularization of society. Only by accepting a totalitarian philosophy, either in religion or politics or both, can the state be equated with society. We are a religious people even though our government is secular. Our democratic state must be secular, for it does not purport or seek to pre-empt all of societal life. Similarly the public school need not and should not be the totality of the education process." (as cited in Alexander and

tempt to replace Roberts' books with other religious books. The District made no statements to students regarding the removal of the books. The District refrained from any action which could be interpreted as an endorsement of religion or non-religion. Roberts' reading of the Bible was restricted only in the classroom setting. The primary effect of the District's actions was not to further the interests of those who believe in no religion, but to insulate students from undue exposure to Roberts' religion.

Roberts testified that he was not proselytizing or teaching religion in his classroom, but was merely providing an open reading forum where students are free to read books of their own choice. We have considered this testimony in the totality of the circumstances, and find that Roberts underestimates the potential effect of his actions on impressionable fifth grade students.

■ The fact that state action with respect to religion is denominationally neutral, or the fact that its observance is purely voluntary, does not serve to free the action from the limitations of the Establishment Clause. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Roberts cannot expect elementary school children to discern the nuances, if any, which would indicate that there is a true neutrality in his reading of the Bible or in his selection of reading material for his class library. *Bell v. Little Axe Independent School Dist. No. 70*, 766 F.2d 1391 (10th Cir.1985).

■ Roberts argues that he is not actively engaged in teaching the Bible during the independent reading period. However, in our view, a teacher can be actively engaged in teaching students regardless of whether verbal interaction takes place. Roberts testified that he was reading to set an example for the children of an adult

reading. We find that Roberts' choice of reading material is no less an example than his act of reading. When reading religious material in the classroom, the teacher must exercise great care so as not to advance a religious view. Taken in their totality, Roberts' reading of the Bible and the religious books and poster in his classroom present the appearance that Roberts is seeking to advance his religious views.

■ We are not persuaded that a teacher's discrete, inconspicuous, and silent reading of the Bible in the classroom would necessarily expose students to undue religious influence. We do not assume the anomalous position of prohibiting in the classroom the inconspicuous reading of a book which is available in the school library. Roberts' silent reading of the Bible thus presents a closer question and a more difficult balance of First Amendment rights. When a teacher's silent reading of the Bible provokes students' curiosity about the Bible's religious teachings, prompts questions from students of a religious nature, or is a subterfuge or a vehicle for advancing a particular religious view, that balance falls definitely in favor of the students and renders the presence of the Bible constitutionally impermissible.

A teacher's silent reading of the Bible does not in every instance result in a constitutional violation. Where the Bible serves as a secular educational reference, is related to an approved curriculum, or is read in such a manner that students are insulated from undue religious influence or indoctrination, then school officials may not prohibit its use or presence in the classroom.

■ When part of a secular course of study, use of the Bible withstands constitutional scrutiny. *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).[18] A study of American history

Alexander, American Public School Law (2d ed. 1985)).

**18.** The distinctions to be drawn between secular and religious uses of Biblical materials are illustrated in *Wiley v. Franklin*, 497 F.Supp. 390 (D.Tenn.1980). The court upheld the study of

the parables of Jesus regarding the uses of fables and parables as a method of teaching, and of the Biblical narrative on the establishment of the ancient Kingdom of Israel, in order to compare that saga with the problems of establishing the modern day state of Israel. The court disapproved the study of the prophecies of Daniel; of

would be incomplete without reference to the Bible. The American revolution and the founding of our country cannot be taught without a discussion of religious freedom and occasional reference to the Bible.[19] Likewise, it would be impossible to understand the civil rights movement of the 1960's without reference to religious groups and their beliefs in Christianity and the Bible.

The study of literary works, such as Shakespeare, Milton, and Dante, is greatly enhanced by reference to the Bible. A study of the evolution of agricultural practices finds that Biblical law prescribed giving the land a rest every seventh year, (Exodus 23), an accepted practice in today's agricultural science. An inquiry into the roots of our modern day privilege against self-incrimination would be incomplete without reference to the Bible.[20] The Bible's Song of Solomon may be as fruitfully studied for its poetic qualities as its religious precepts. Such a broad range of secular uses is not to be found in the two religious books in question. This distinction must be considered in an Establishment Clause analysis.

It is within the sound discretion of school officials to make an objective determination of whether a teacher's use of a Bible is consistent with a secular purpose or constitutes undue religious influence. Our ruling does not limit the power of school officials to prescribe rules of classroom conduct for their teachers. For example, Roberts does not have a constitutional right to read the Bible when the District's rules require him to be engaged in teaching his students.

Roberts argues that because he is allowed to teach American Indian religion, (Plaintiffs' Exhibits 18–20), he should be allowed to resume his reading of the Bible and replace his books in the classroom library. Roberts' argument underscores the difference between teaching *about* religion, which is acceptable, and teaching religion, which is not. *Florey v. Sioux Falls,* 619 F.2d 1311 (8th Cir.), *cert. denied* 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980). Roberts' teaching of American Indian religion is teaching *about* religion. It is but a part of a secular, historical course of study approved by the District as part of the curriculum for fifth grade students.[21] The students' exposure to Roberts' religious books and Bible cannot be deemed teaching about religion in the same way. We find that exposure to the tenets of a little known religion, such as those followed in American Indian culture, is far less influential on young students than exposure to a modern day, widely observed religion which is a recognizable part of our society.

We note parenthetically that Roberts incorrectly urges reliance on the decision in *Cary v. Board of Education Arapahoe School District,* 598 F.2d 535 (10th Cir. 1979), as support for his argument that his books were improperly "censored". Roberts fails to recognize that *Cary* did not deal with religious books and thus did not encounter the conflict between the Establishment Clause and the Free Speech Clause which characterizes the present case.

## VI. *Freedom of Speech/Academic Freedom*

Roberts asserts that his First Amendment rights to freedom of speech and aca-

---

God's anger over Israel's idolatry of the golden calf; and the story of Sodom and Gomorrah as carrying an unconstitutional religious message.

**19.** For example, the Liberty Bell is inscribed with the following Biblical verse: "Proclaim Liberty Throughout All The Land Unto All The Inhabitants Thereof." (Leviticus XXV–X).

**20.** See *Miranda v. Arizona,* 384 U.S. 436, n. 27, 86 S.Ct. 1602 n. 27, 16 L.Ed.2d 694 (1966), where the Supreme Court traced the self-incrimination privilege back to Biblical times: "To sum up the matter, the principle that no man is

to be declared guilty on his own admission is a divine decree." Maimonides, Mishneh Torah (Code of Jewish Law), Book of Judges, Laws of the Sanhedrin, ch. 18, § 6, III Yale Judaica Series 52–53. See also, Lamm, The Fifth Amendment and its equivalent in the Halakhah, 5 Judaism 53 (Winter, 1956). Examples of Biblical references on other subjects are included in the Appendix.

**21.** Such decisions are within the discretion of school officials. *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

demic freedom were violated when he was ordered to remove the two religious books and refrain from reading the Bible in his classroom. It is beyond question that teachers are entitled to First Amendment freedoms in the public schools. *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). However, these rights do not "require the government to open the use of its facilities as a public forum to anyone desiring to use them." *Id.*

The teacher's right to academic freedom is far from absolute. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960). In the public school context, an individual's free speech rights may be limited if the exercise of that right substantially interferes with the rights of others. *Tinker,* 393 U.S. at 513, 89 S.Ct. at 740. The Supreme Court has never held that a teacher has a constitutional right to teach what he sees fit, nor to pre-empt parents' decisions regarding what courses their children should take. *Mercer v. Michigan State Bd. of Educ.,* 379 F.Supp. 580, 586 (E.D.Mich.1974), aff'd mem., 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678 (1974).

Roberts' argument graphically illustrates the tension that exists between the Establishment Clause and the Free Speech Clause of the First Amendment. A court's inquiry does not end with a conclusion that an individual has asserted a valid free speech right. The court must also decide whether the exercise of that free speech right invades the rights of others. *Breen v. Runkel,* 614 F.Supp. 355, 359 (D.Mich. 1985).

In the instant case, we must balance Roberts' right to free speech against his students' right to be free of religious influence or indoctrination in the classroom. *See, Board of Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982); *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 3224, 87 L.Ed.2d 267 (1973). We find that the balance lies in the students' favor. Notwithstanding Roberts' arguments to the contrary, fifth grade students are vulnerable to the examples set by their teachers. As Justice Felix Frankfurter stated:

> That a child is offered an alternative may reduce the constraint, [but] it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and nonconformity is not an outstanding characteristic of children.

*McCollum v. Board of Education,* 333 U.S. 203, 227, 68 S.Ct. 461, 92 L.Ed. 649 (1949).

Families entrust public schools with the education of their children, but condition that trust on the understanding that the classroom will not be purposely used to advance religious views that may conflict with the private beliefs of the student and his or her family. *Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). The state and public education must therefore take great care to see that the coercive power which they possess through mandatory attendance and teacher role models does not serve to advance religion.

Inescapably, teachers serve as role models for their students. *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 683, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986). Roberts concedes that he serves as a model when he reads the Bible in front of his students. Roberts argues that he exerts no influence on the students because they cannot see what he is reading when he is at his desk. Roberts makes this argument in contradiction to his admission that, over the years, at least a few students have come up to his desk and asked him about the Bible. Roberts also testified that he sometimes asks a child to come to his desk and read to him during the independent reading period.

It is unrealistic to think that bright, energetic students are oblivious to what their teacher reads. In this case, the right of students and their parents to be free of religious influence in the classroom outweighs Roberts' right to free speech/academic freedom. Roberts cannot circumvent his own violation of constitutional lim-

its by a misplaced claim of a violation of the right to free speech/academic freedom.

## VII. *Standing of Parents to Bring Suit*

Defendants assert that none of the student plaintiffs have standing to challenge the defendants' actions toward Roberts' classroom activities because none of them are presently students in his class. We agree.

Article III of the Constitution requires a party to show that he personally has suffered some actual or threatened injury that can be traced to the challenged action and is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). This injury must be more than the psychological consequence of observing conduct with which one disagrees. *Valley Forge*, 454 U.S. at 485, 102 S.Ct. at 765.

Beyond the constitutional requirements are the following principles: (1) the plaintiff must generally assert his own legal rights; and (2) the court must refrain from adjudicating "generalized grievances" most appropriately addressed by one of the other branches of government. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

The Supreme Court has recognized the standing of parents of school children "who are *directly* affected by the laws and practices against which their complaints are directed". *Abington School District v. Schempp*, 374 U.S. 203, 224, n. 9, 83 S.Ct. 1560, 1572, n. 9, 10 L.Ed.2d 844 (1963). (Emphasis added). However, in the instant case, it is not the rights of the student plaintiffs which are directly involved.

None of the children are presently enrolled in Roberts' class. Kelly Nelson had already graduated from Roberts' class by the time this law suit was filed. There is no certainty that Amy Nelson or Kelly White will have Roberts as their fifth grade teacher. There is no allegation that other classes are affected by defendants' actions as to Roberts.

The student plaintiffs have neither suffered nor are threatened with an injury which can be directly traced to the challenged actions. They cannot claim First Amendment violations for the removal of books to which they did not have access, nor for actions against a teacher in whose class they were not enrolled. *See, Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). They, and consequently their parents, have no standing to attack the defendants' actions with respect to Roberts.

Student plaintiffs have not suffered a violation of their right to obtain information. Even if we were to concede that the elementary school and Roberts' class are open forums which spawn a right to information, this would not overcome Roberts' violation of the Establishment Clause. *Bell v. Little Axe Independent School Dist. No. 70*, 766 F.2d 1391 (10th Cir.1985).

## ORDER

IT IS HEREBY ORDERED, that Plaintiff Ken Roberts' request for injunctive relief is DENIED. Roberts' claims and cause of action are DISMISSED. The claims and cause of action of Plaintiffs Marc Nelson and Zay Nelson, as parents and next friends of Kelly Nelson and Amy Nelson, are DISMISSED. The claims and cause of action of Debra Jean White, as parent and next friend of Kelly White, are DISMISSED.

It is further ORDERED that Defendants Kathleen Madigan and School District No. 50 replace the missing Bible in the school library of Berkeley Gardens Elementary School. Defendants Kathleen Madigan and School District No. 50 are ENJOINED from removing the Bible from the Berkeley Gardens Elementary School library in the future.

The Clerk of the Court is DIRECTED to enter judgment as directed herein. Defendants to recover their costs.

## APPENDIX

For further inquiry into the role of religion in public education the reader is directed to the following:

**1520**

Annotation: Bible Distribution in the Schools, 45 ALR2d 742.

*Developments in the Law—Religion and State,* 100 Harv.L.Rev. 1606 (1987).

J.W. Ehrlich, The Holy Bible and the Law. (Oceana Publications, Inc. 1962.

Benjamin B. Sendor, A Legal Guide to Religion and Public Education (National Organization on Legal Problems of Education 1988).

William D. Valente, Education Law—Public and Private (West Publishing Co.1985).

Kern Alexander and M. David Alexander, American Public School Law (2d Edition, West Publishing Co.1985).

Rodney K. Smith, Public Prayer and the Constitution (Scholarly Resources, Inc. 1987).

Sam Duker, The Public Schools and Religion (Harper and Rowe 1966).

Kenneth M. Dolbeare and Phillip E. Hammond, The School Prayer Decisions (The University of Chicago Press 1971).

John H. Laubach, School Prayers (Public Affairs Press 1969).

Leo Pfeffer, God, Caesar and the Constitution (Beacon Press 1975).

Leo Pfeffer, Church, State and Freedom (Beacon Press 1967).

*Biblical References on Selected Subjects:*

Restitution and Damages: Exodus 22:1, Leviticus 6:2

Usury: Ezekiel 18:13

Education: Ecclesiasticus 7:23, Psalm 15

Health: Ecclesiasticus 30:14, 15

Legal Systems: Deuteronomy 16:18

Music: Second Samuel 6:5

Athletics: First Corinthians 9:24–27

Education: Ecclesiasticus 7:23

Employer–Employee Relations: Colossians 3:22–4:1

Labor Law: Deuteronomy 24:14, Jeremiah 22:13

Contracts: 1 Kings 5:8–11

Statutes of Limitations: Deuteronomy 15:1, 2

Animal Husbandry: John 10:11

Bailments: 22:10

Birds: Deuteronomy 14:11, 32:11